COMMONWEALTH vs. DEXTER DUTNEY
(and five companion cases[1]).

Middlesex.    March 11, 1976. — June 14, 1976.

Present: HALE, C.J., KEVILLE, & GRANT, JJ.

*Bribery. Public Officer. Practice, Criminal,* Requests, rulings and
instructions, Lesser included crimes. *Evidence,* Common criminal
enterprise, Collateral matter, Impeachment of witness. *Pleading,
Criminal,* Indictment, Duplicitous charges.

Evidence that the brother of the chairman of a town's board of select-
men solicited and received money from a liquor license applicant in
order to guarantee favorable votes from the chairman and two board
members, that shortly after voting to approve the application the
two board members received $500 from the chairman's brother, that
neither member questioned the reason for the payment, and that
each requested that the brother not tell the member's wife of the
payment warranted findings that both selectmen had violated the
provisions of G. L. c. 268A, § 2(*b*). [365-369]
The judge at a criminal trial did not err in refusing to instruct the jury
that it is "most proper" to acquit a defendant where the testimony
against him is that of an alleged accomplice and is uncorroborated.
[369-370]
At the trial of two defendants on indictments under the provisions of
G. L. c. 268A, §§ 2(*b*), 3(*b*), and 17(*a*), there was no error in the
admission of out-of-court statements made by the alleged agent of
the defendants upon a representation by the prosecutor that a joint
enterprise would be proved where the judge made the admission of
such evidence subject to a motion to strike and instructed the jury
not to consider the proposed testimony unless a joint enterprise
were proved. [370-371]
At the trial of two defendants charged with soliciting and receiving a
bribe in exchange for their favorable votes on a liquor license ap-
plication, it was prejudicial error as to both defendants to allow the
prosecutor in his cross-examination of the wife of one defendant to
read portions of a newspaper article regarding the case. [371-373]
There was no merit to a contention in a criminal case that indictments
under G. L. c. 268A, §§ 2(*b*), 3(*b*), and 17(*a*), should have been dis-
missed because they alleged that the offences described therein took
place "on or about the tenth day of April . . . to on or about the
thirtieth day of May." [374]

---

[1] Commonwealth vs. Dexter Dutney (two indictments) and Common-
wealth vs. Leo Grondine (three indictments).

An offence alleged under G. L. c. 268A, § 3(*b*), is a lesser included offence of an offence alleged under § 2(*b*). [374-377]

On the evidence presented at a criminal trial, indictments under G. L. c. 268A, § 17(*a*), were repetitions of indictments under § 3(*b*), and it was therefore error to deny the defendants' motions to require elections as between indictments. [377]

INDICTMENTS found and returned in the Superior Court on June 14, 1974.

The cases were tried before *Rutledge, J.*

*Charles J. Wilkins (Earl Auerbach* with him) for the defendants.

*Bonnie H. MacLeod-Griffin,* Assistant District Attorney, for the Commonwealth.

GRANT, J.   Dutney and Grondine (defendants) have been convicted by a jury on separate indictments laid under the provisions of G. L. c. 268A, §§ 2(*b*), 3(*b*) and 17(*a*),[2] respectively, and both have appealed. We consider those assignments of error (G. L. c. 278, § 33D) which are grounded on exceptions (*Commonwealth* v. *Hall,* 369 Mass. 715, 717 [1976]), which have been argued (Rule 1:13 of the Appeals Court, as amended effective February 27, 1975, 3 Mass. App. Ct. 801), which have merit, and which are directed to questions which seem likely to arise upon the retrial which we hold is required.

---

[2] Those sections read in pertinent part as follows: "Whoever, being a . . . municipal employee . . . directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of value for himself . . . in return for . . . being influenced in his performance of any official act or any act within his official responsibility . . . shall be punished . . . ." § 2(*b*). "Whoever, being a . . . municipal employee . . . otherwise than as provided by law for the proper discharge of official duty, directly or indirectly, asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of substantial value for himself for or because of any official act or act within his official responsibility performed or to be performed by him . . . shall be punished . . . ." § 3(*b*). "No municipal employee shall, otherwise than as provided by law for the proper discharge of official duties, directly or indirectly receive or request compensation from anyone other than the . . . town . . . in relation to any particular matter in which the same . . . town is a party or has a direct and substantial interest." § 17(*a*). The punishments severally prescribed are such that a violation of § 2(*b*) is a felony (see G. L. c. 274, § 1), while violations of §§ 3(*b*) and 17(*a*) are misdemeanors.

1. We consider first the denial of the motions for directed verdicts which were presented by both defendants at the close of the Commonwealth's case. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 149-150 (1976).[3] The following is a summary of the evidence most favorable to the Commonwealth at that time.

The defendants were two of the five members of the board of selectmen (board) of the town of Dracut (town), which was also the local licensing authority of the town for the purpose of passing initially on applications for licenses to serve alcoholic beverages. See G. L. c. 138, §§ 1, 15A and 16B.[4] The other three members of the board were Robert Gallagher (chairman), Roger Daigle and William Day.

In mid March, 1973, one Roland Gariepy, the manager of a restaurant in Dracut owned by himself and his brothers Robert and Normand Gariepy, filed with the board an application for a license to serve alcoholic beverages at the restaurant. Following the required statutory notices and publication, the application came on for hearing before the board on April 3, 1973. Roland and Normand Gariepy attended the hearing, at which all five members of the board were present. No one spoke against the application, and the board voted unanimously to take the matter under advisement.

On April 9 or 10 Robert Gallagher had a conversation with his brother Thomas in front of the Dracut town hall. Thomas, who was vice-chairman of the Dracut school com-

---

[3] We need not consider whether there was error in the denial of the motions for directed verdicts which were presented at the close of the Commonwealth's opening. *Commonwealth* v. *Sandler*, 368 Mass. 729, 739-740 (1975).

[4] Each indictment alleged that the defendant named therein had acted as a "municipal employee" of the town, and all six indictments were tried by agreement on the footing that the defendants were municipal employees within the meaning of G. L. c. 268A, §§ 1(*g*), 2(*b*), 3(*b*) and 17(*a*). See *Commonwealth* v. *Avery*, 301 Mass. 605, 607, 609-611 (1938); *Commonwealth* v. *Dowe*, 315 Mass. 217, 224 (1943); *Dixie's Bar, Inc.* v. *Boston Licensing Bd.* 357 Mass. 699, 701-702 (1970); *Boston Licensing Bd.* v. *Alcoholic Beverages Control Commn.* 367 Mass. 788, 796 (1975).

366            4 Mass. App. Ct. 363

Commonwealth *v.* Dutney.

mittee, was a political associate of both Grondine and Dutney. He had donated money to Grondine when he had first run for selectman and had worked in that campaign. He had also donated a small amount of money to Dutney's 1972 campaign for selectman. Robert said that he had been in touch with Grondine and Dutney and that they were uneasy about the vote on the Gariepy license application. He mentioned the possibility of strong opposition from people near the restaurant, said, "Why should I, you know — you know, put out my political career and give Bob Gariepy a vote . . .", and stated that if Gariepy were to get a license he should pay for it. Robert stated his belief that Daigle and Day would vote in favor of issuing the license. Robert and Thomas agreed that a unanimous vote would be advantageous because if any opposition to a license should arise, no member of the board would be in a position to join in any criticism of the board's action in approving the application.

At its meeting of April 10 the board gave further consideration to the application. No one spoke in opposition. Daigle, seconded by Day, moved to approve the application. Robert Gallagher moved that the application be tabled for another week because (he said) he had a few questions he wanted to clear up. Daigle withdrew his motion; Day seconded Gallagher's motion; and Gallagher's motion passed unanimously.[5]

On Sunday, April 15, Robert Gallagher caused the Dracut police to deliver to Roland Gariepy at his home a letter in which Gallagher accused Gariepy of saying that Gallagher was "looking for a bribe" and in which Gallagher threatened to "[take Gariepy] to court on behalf of the selectmen." Gariepy telephoned Dutney and read him the letter. Dutney said, "Wait, I'll make a phone call and I'll get back to you." Dutney did not call back. However,

---

[5] The actions of Daigle and Day in deferring to Gallagher on this occasion appear to have been prompted solely by courtesy. There is nothing in the record to suggest that either Daigle or Day suspected any impropriety until some time after the approval of the license application.

about ten minutes later, Thomas Gallagher called Roland Gariepy, apparently as a result of a telephone call he had just received from his brother Robert. Thomas stated that he represented the majority of the selectmen and requested Robert Gariepy's telephone number. Roland Gariepy advised Thomas that he would have his brother Robert call him. When Robert Gariepy did call Thomas Gallagher, the latter said, "My brother is fighting with yours. Would it be possible to get together with you and discuss this thing?" The two agreed to meet the following morning.

When they did meet on the following morning (April 16) Thomas Gallagher said to Robert Gariepy, "If you are interested in getting ... [the license], it will cost you $2,000," adding that he could "guarantee" the votes of Robert Gallagher and of Dutney and Grondine. Robert Gariepy replied that getting the money would not be a problem but that he would have to discuss the matter with his brothers.

The next morning (April 17) the three Gariepy brothers met and agreed among themselves that they would pay the $2,000. Robert Gariepy then met with Thomas Gallagher. Gariepy said, "I understand in politics that if you have something and I want that something, I have to pay for that something. Why should I make money and you people who gave me that certain thing, not make anything on the deal?" Gallagher repeated the terms of the deal he had proposed the day before, stating again that he could guarantee the votes of his brother Robert and of Dutney and Grondine. Gariepy gave Gallagher $2,000, which Gallagher counted and put in his pocket. Gallagher left the meeting and proceeded to his brother Robert's apartment, where he gave Robert $500 of the $2,000.

That evening (still April 17) Roland and Normand Gariepy attended another meeting of the board at which the matter of the license application again came up for further consideration. Robert Gallagher said, "We held up Mr. Gariepy long enough. We will give him his license." The board then voted unanimously to approve the license ap-

plication. Following the meeting Thomas Gallagher met
Dutney in the men's room of a restaurant, apparently by
chance. Gallagher said, "What do you want to do about
the money?" Dutney replied, "No hurry on the money, no
hurry."

The next afternoon (April 18), following a visit to his
brother in the latter's apartment, Thomas Gallagher went
to Grondine's home, arriving between 6:00 and 7:00 P.M.
Grondine's wife met Gallagher and told him Grondine was
in the bathroom taking a bath. Gallagher asked if he could
see Grondine in the bathroom, to which Mrs. Grondine
replied in the affirmative. Gallagher went into the bath-
room, gave Grondine $500 and said, "Compliments of
Mr. Gariepy. This is the Gariepy thing." Grondine said,
"Thank you. Don't tell my wife."

Gallagher departed and drove to Dutney's house. Gal-
lagher gave Dutney $500 and said, "This is from Mr. Gar-
iepy, the Gariepy thing." Dutney said, "Thank you" and
asked Gallagher not to say anything to his wife (Janice).
Gallagher replied, "Of course, I wouldn't say anything to
Janice. I wouldn't say anything to anybody." Gallagher
added, "As far as you know you don't even know which
Gariepy I met with. All you know is: You got the money."

There was direct evidence that $500 of the Gariepy
money went to each defendant. There was ample evidence
from which the jury could reasonably infer (see *Common-
wealth* v. *Barker*, 311 Mass. 82, 90-91 [1942]) that Thomas
Gallagher was acting as the authorized agent (bagman)
of both defendants. Compare *Commonwealth* v. *Connolly*,
308 Mass. 481, 485, 489-490 (1941). See also *Common-
wealth* v. *Mannos*, 311 Mass. 94, 108 (1942). The jury
could also infer (1) from the short period of time inter-
vening between Gallagher's original assurance of the votes
of both defendants (repeated by him at the time the
money was first passed) and the actual casting of those
votes (compare *Commonwealth* v. *Galvin*, 310 Mass. 733,
745 [1942]) and (2) from the failure of both defendants
when they received their respective shares of the money
to inquire as to the reason for the sudden generosity of

the Gariepys (compare *Commonwealth* v. *Kelley*, 359 Mass. 77, 91-92 [1971]) that both defendants had solicited a bribe from the Gariepys and had voted in the expectation of receiving, and had received, the same. The inferences thus suggested were reinforced as to Dutney by his remarks to Gallagher ("No hurry on the money, no hurry") almost immediately following his vote. The consciousness of guilt inherent in the separate requests of both defendants that Gallagher not tell their respective wives could hardly have escaped the jury. The evidence was clearly sufficient to warrant findings that both defendants had violated the provisions of G. L. c. 268A, § 2(*b*). If the jury wished to reject the evidence of corrupt intent, they could properly find violations of G. L. c. 268A, § 3(*b*) and § 17(*a*).

Accordingly, we have no hesitation in concluding that the motions for directed verdicts, so far as they challenged the sufficiency of the evidence, were properly denied as to all six indictments.[6] We shall consider at a later point in this opinion whether the defendants were properly convicted and sentenced on all three of the respective indictments against them.[7]

2. The defendants duly excepted to and assigned as error the judge's denial of five of their virtually identical requests for instructions. Four of those requests were addressed to the alleged insufficiency of the evidence to warrant particular findings and raise no question not already disposed of in part 1 of our opinion. The fifth request was directed to the testimony of Thomas Gallagher (discussed in part 3 hereof) and was to the effect that it is "most proper" to acquit a defendant where the testimony against him is that of an alleged accomplice and is uncorroborated. The judge could not be required to give

---

[6] As the Commonwealth's case did not deteriorate in any respect before the close of all the evidence, we need not give separate consideration to the additional motions for directed verdicts which were presented at that time. *Commonwealth* v. *Kelley,* 370 Mass. 147, 150, n. 1 (1976).

[7] See part 7, *infra.*

any such instruction. *Commonwealth* v. *Beal,* 314 Mass. 210, 231-232 (1943). See also *Commonwealth* v. *DeBrosky,* 363 Mass. 718, 729 (1973).

3. Thomas Gallagher was the chief witness for the prosecution, and much of the evidence which has been summarized in part 1 hereof came in the form of his testimony. The jury were advised that he had pleaded guilty to indictments for like offences and was awaiting sentencing.[8] The defendants saved their rights with respect to a number of rulings (a) by which Roland and Robert Gariepy were permitted to testify to statements made to one or the other of them by Thomas Gallagher during the period April 15 through 17 and (b) by which Thomas Gallagher was permitted to testify to incriminating statements made to him by Robert Gallagher and both defendants during the period April 9 or 10 through 18. When the first objection was voiced the prosecutor, out of the hearing of the jury, gave the judge a brief outline of the evidence he expected to introduce. The outline did not vary in any material respect from the evidence which was subsequently introduced and which has already been summarized. The judge ruled that he would admit the particular testimony then under consideration de bene, subject to later motions to strike if the prosecution should fail to prove that Thomas Gallagher had been acting as the agent of the defendants at the time of his making the statement in question. The jury were instructed not to consider the proposed testimony as evidence against the defendants unless the prosecution should offer further and independent evidence that Thomas Gallagher had authority to act on behalf of the defendants.[9] The other testimony still complained of was admitted on the same basis, and the substance of the foregoing instruction was repeated on a

[8] Robert Gallagher appears to have been in the same position, but he was not called to testify.

[9] Our resolution of the admissibility of the evidence in question does not require us to decide whether the judge's agency analysis was technically correct, or whether the instruction was too favorable to the defendants.

further occasion. The defendants moved at the close of
the evidence to strike out "all the evidence let in De Bene
and all the conversations testified to that were not in the
presence of the defendant[s]." The motions were denied,
subject to exceptions.

An examination of the testimony in question discloses
that all of it "was admissible under that exception to the
hearsay rule which permits the statements of one person
engaged in a common enterprise, made during the course
of and in pursuance of the enterprise, to be admissible
against all persons engaged in that common undertaking."
*Commonwealth* v. *Simpson*, 370 Mass. 119, 122 (1976),
and cases cited. Nor was there error in the judge's refusal
to insist on complete proof of participation in the common
enterprise by both Gallaghers and both defendants prior
to the admission of any of the testimony in question. It
was enough that there was evidence of such participation
by the time the evidence was closed. *Commonwealth* v.
*Connolly*, 308 Mass. 481, 492 (1941). *Commonwealth* v.
*Dominico*, 1 Mass. App. Ct. 693, 717-718 (1974).

4. Grondine called his wife as a witness. She testified on
direct examination that Thomas Gallagher had not come
to the Grondine home at the time (April 18, 1973) when
Gallagher had said he had gone there and given Grondine
$500 while the latter was in the bathroom. On cross-exami-
nation Mrs. Grondine denied that she had ever discussed
the events of April 18 with anyone (including Grondine)
prior to the previous day, when, she said, she had first
discussed the matter with Grondine's counsel. The prose-
cutor confronted Mrs. Grondine with a copy of what he
represented was the front page of the June 14, 1974, is-
sue of a Lowell newspaper which appears to have borne a
photograph of Grondine in conjunction with a headlined,
four-column article.[10] In response to questions by the pros-
ecutor, Mrs. Grondine testified that she had read the
headline of the article on the day of its publication, that

---

[10] The article is not before us, but we recognize its date as that on
which the indictments were returned in these cases.

she had asked her husband about the headline, and that he had denied any knowledge of its subject matter. Following some rather confusing testimony on the further questions whether Mrs. Grondine had read the article itself and had discussed its contents with Grondine on June 14, the prosecutor started to read from the article in the presence of the jury. On objection by Grondine the judge excluded any question as to the contents of the article "at this time" but ruled that the prosecutor could continue to question the witness as to whether she had read the article in its entirety and had discussed its contents with her husband. In response to a specific question by the judge, the witness admitted that she had read the article but unequivocally denied that she had discussed its contents with her husband. The prosecutor then asked the witness whether she had read in the article a statement to the effect that Thomas Gallagher had come to her home on April 18, had walked into her house and bathroom, and had handed Grondine $500. Grondine made a timely objection as soon as it became apparent that the prosecutor intended to read from the article, and before any part of its contents was actually summarized. The objection was overruled, subject to Grondine's exception. Mrs. Grondine again admitted that she had read the article but reiterated that she had not discussed it with her husband. Grondine moved to strike everything concerning the article. Dutney moved for a mistrial. Both motions were denied, subject to exceptions.

As we read the transcript, the repeated objections to the question were based primarily on the hearsay nature of the statements contained in the article.[11] The Common-

---

[11] The judge conducted three different bench conferences in response to the various objections. None of those conferences was recorded, but we think it clear from what does appear on the record that the judge was aware of the portions of the article which the prosecutor proposed to summarize in his question. We do not know whether the article purported to represent that Gallagher had in fact gone to the Grondine home or whether it merely purported to report a statement that Gallagher might have made to that effect; the jury were left to speculate that it might be the former.

wealth argues that the statements were offered on the issue of the credibility of the witness, the theory being that the jury could have found that a wife who had admittedly read such an article concerning her husband would have discussed its contents with him, that the witness had been lying when she had denied the existence of any such discussion, and thus that she had been lying when she had denied that Thomas Gallagher had come to her home and seen her husband on April 18. The record contains support for the proposition that such was the purpose of the question.

Whether Mrs. Grondine had discussed the contents of the article with her husband was a collateral matter first explored by the prosecutor on his cross-examination of the witness. We are of the opinion that the prosecutor was bound by the witness' answer on that point and that he should not have been permitted to contradict that answer, even for the purpose of impeaching the witness. *Commonwealth* v. *Farrell*, 322 Mass. 606, 623-624 (1948), and cases cited. *Leone* v. *Doran*, 363 Mass. 1, 14-15 (1973). The question was obviously prejudicial to Grondine because it embraced hearsay and constituted all the jury ever heard which tended to corroborate in any way the testimony of Thomas Gallagher on the vital question whether Grondine had accepted $500 for his favorable vote on the license application. Compare *Commonwealth* v. *Pleasant*, 366 Mass. 100, 102-103 (1974); *Commonwealth* v. *Ferrara*, 368 Mass. 182, 193-194 (1975). We think the prosecutor's summary of the article also tended to lend credence to Gallagher's further (and equally uncorroborated) testimony to the effect that he had left Grondine's home, driven to Dutney's home, and given Dutney $500. We conclude that both defendants should have a new trial.

5. Other evidence questions of lesser significance are considered in the appendix to this opinion. We are of the opinion that none of the irregularities there disclosed, standing by itself, warrants the granting of a new trial to either defendant. We trust that none of the irregularities will be repeated on the retrial.

6. Both defendants moved prior to trial that the indictments be dismissed on the ground, among others, that they "do not set forth any offense known to law in any sufficient or legal manner." The motions were referred to the trial judge. Dutney renewed his motion at the conclusion of the Commonwealth's case, and both defendants renewed their motions at the conclusion of all the evidence. The motions were denied. The indictments all allege that the particular offences described therein took place "on or about the tenth day of April in ... [1973] to on or about the thirtieth day of May [1973]." The argument appears to be that the solicitation of a bribe or other illegal compensation is not a continuing offence. We detect no problem with the language of any of the indictments. See and compare *Commonwealth* v. *Stasiun,* 349 Mass. 38, 44-45 (1965). As we read the indictments, and particularly the double use of the phrase "on or about," they disclose nothing more than an understandable measure of hesitation on the part of the draftsman to circumscribe too narrowly the time frame within which the offences were committed.[12]

7. Prior to trial the defendants filed separate motions in which they asserted that all three of the indictments against them charged but one crime and by which they sought to compel the Commonwealth to elect among the indictments. These motions were also referred to the trial judge.[13] Both motions were renewed and denied; exceptions were duly saved. Both defendants were convicted on all three of the indictments against them, and both were sentenced to three concurrent terms of equal length in a house of correction.

---

[12] In considering this point we have given the defendants the benefit of the doubt whether their respective assignments of error numbered 28 comply with the requirement of the third sentence of G. L. c. 278, § 33D.

[13] It does not appear that the Commonwealth disclosed, or was requested to disclose, the evidence available to it at the time the motions were originally presented. It is for this reason, perhaps, that the defendants have not argued that their motions should have been passed upon in advance of trial. See and compare *United States* v. *Cogan,* 266 F. Supp. 374, 379-380 (S.D. N.Y. 1967).

The question whether there was error in any of the denials requires a brief consideration of some of the differences and interrelationships between and among the varying provisions of G. L. c. 268A, §§ 2(*b*), 3(*b*) and 17(*a*) (n.2, *supra*). In order to obtain a conviction under § 2(*b*) the Commonwealth must show a corrupt intent on the part of the defendant to be influenced in his future performance of an official act. A showing of such intent is not necessary to a conviction under § 3(*b*); it is enough that a defendant requested or received something of substantial value for or because of an official act to be performed by him.[14] See the Report of the Special Commission on Code of Ethics, 1962 House Doc. No. 3650, at 11. In order to obtain a conviction of a municipal employee under § 17(*a*) the Commonwealth need not show either a corrupt intent or that the request for or acceptance of outside compensation was related to an official act performed or to be performed by the defendant himself; it is enough that a defendant requested or accepted such compensation in relation to any particular matter in which his city or town was a party or had a direct and substantial interest.

We have already stated our opinion that the evidence in these cases was sufficient to warrant conviction of both defendants on all three of the respective indictments against them.[15] But that does not answer the question whether the Commonwealth was entitled to go to the jury on all three indictments against both defendants, which was the point raised by the motions to require elections as between and among the various indictments. After thorough consideration of the evidence presented and of what we consider to be the relevant legal authorities, we

[14] Section 3(*b*) also appears to reach a defendant's solicitation or acceptance of something of substantial value following and by reason of an official act already performed by him. Contrast *Commonwealth* v. *Mannos,* 311 Mass. 94, 112 (1942), and *Commonwealth* v. *Beal,* 314 Mass. 210, 224, 232-233 (1943), decided under earlier bribery statutes.

[15] See part 1, *supra*.

have concluded that the judge erred in allowing the cases to go to the jury on all the indictments.

First, on the evidence which was adduced in these cases, we think that the offences alleged under § 3 (*b*) were lesser included offences of those alleged under § 2 (*b*). The evidence in these cases bears many similarities to that introduced in the case of *United States* v. *Brewster*, 506 F. 2d 62, 67-74 (D.C. Cir. 1974), where the court had occasion to consider the interrelationships between the provisions of 18 U.S.C. §§ 201 (c) (1) and 201 (g), which are the Federal counterparts of our c. 268A, §§ 2 (*b*) and 3 (*b*), respectively.[16] Following a careful analysis of the differences between the language employed in § 201 (c) (1) and that employed in § 201 (g), the court concluded that the only difference of substance between the two sections is the requirement of a corrupt intent on the part of the defendant under the first section. The conclusion was that the offence alleged under the second section was a lesser included offence of that alleged under the first section. Compare *United States* v. *Umans*, 368 F. 2d. 725, 728-730 (2d Cir. 1966), cert. dism. 389 U. S. 80 (1967).

We have already noted the element of a corrupt intent on the part of a defendant as the principal feature distinguishing an offence under our § 2 (*b*) from one under our § 3 (*b*). We have also determined, in effect, that on the evidence presented in these cases either defendant could have been properly convicted either on the indictment laid against him under § 2 (*b*) or on the indictment laid against him under § 3 (*b*), depending on whether the jury found the particular defendant did or did not have a corrupt intent. Accepting the reasoning of the *Brewster* case, we conclude that as to both defendants the offences alleged under § 3 (*b*) were lesser included offences of those

---

[16] It is clear from the aforementioned Report of the Special Commission on Code of Ethics, at pp. 8 and 10, that many of the concepts underlying what ultimately became G. L. c. 268A (as appearing in St. 1962, c. 779, § 1) were taken from the bill then pending in the Congress of the United States (H. R. 8140, 87th Cong. 1st Session) which emerged in 1962 as 18 U.S.C. §§ 201 et seq.

Commonwealth *v.* Dutney.

alleged under § 2 (*b*). Compare *Commonwealth* v. *Eaton,* 2 Mass. App. Ct. 113, 117-118 (1974). It follows that either defendant could have been properly convicted and sentenced under either section but not under both (*Kuklis* v. *Commonwealth,* 361 Mass. 302, 306-309 [1972]; *Salemme* v. *Commonwealth,* 370 Mass. 421, 423-424 [1976]; compare *Commonwealth* v. *White* (*No. 2*), 365 Mass. 307, 310, 311 [1974], cert. den. 419 U. S. 1111 [1975]) and that the jury should have been so instructed.

The motions to require elections raised a different question with respect to the indictments under § 17 (*a*). On the evidence presented in these cases, the indictments under that section were repetitious of those under § 3 (*b*). Compare *Commonwealth* v. *Ismahl,* 134 Mass. 201, 201-202, 202-203 (1883). Contrast *Commonwealth* v. *Edds,* 14 Gray 406, 407, 409-410 (1860). The evidence was such that no rational jury, properly instructed, could have convicted either defendant under one section and acquitted him under the other. The evidence disclosed offences more aptly described by § 3 (*b*) than by § 17 (*a*), and if the evidence on retrial follows substantially that which has already been summarized, the indictments under § 17 (*a*) should be eliminated, either in response to the motions to require elections as between indictments or by motions for directed verdicts which raise the point of repetition and which are filed at the close of the Commonwealth's case.[17] Compare *Commonwealth* v. *Miller,* 361 Mass. 644, 658 (1972).

The judgments on all six indictments are reversed, and the verdicts thereon are set aside. The cases are to stand for further proceedings consistent with this opinion.

*So ordered.*

---

[17] This point was not raised by any of the motions for directed verdicts which were filed in these cases. Now that the anticipated evidence has been disclosed, the judge may wish to exercise his discretion to sever the indictments laid under § 17 (*a*). See *Commonwealth* v. *Benjamin,* 3 Mass. App. Ct. 604, 623-624 (1975).

Commonwealth *v.* Dutney.

APPENDIX

5(*a*). The evidence was sufficient to warrant a preliminary finding by the judge that it was Dutney with whom Roland Gariepy had had a telephone conversation on the afternoon of April 15, 1973. See the cases cited in *Slater* v. *Burnham Corp. ante,* 791 (1976). See also *Irving Tanning Co.* v. *Shir,* 295 Mass. 380, 383-384 (1936); *Chartrand* v. *Registrar of Motor Vehicles,* 345 Mass. 321, 325 (1963); *Commonwealth* v. *Murphy,* 356 Mass. 604, 610-611 (1970).

5(*b*). The evidence was also sufficient to warrant a like finding that it was Phelan with whom Lieutenant Agnes had had a telephone conversation in December, 1974.

5(*c*). Agnes should not have been permitted to testify to the statements made to him by Mrs. Dutney in the course of the conversations he had had with her in December, 1973, and December, 1974. She had been called by the prosecution and had already admitted during her direct examination that she had made the only prior inconsistent statement which the prosecutor had brought to her attention (see *Cook* v. *Farnum,* 258 Mass. 145, 148 [1927]), and the prosecutor had not met the requirements of G. L. c. 233, § 23, with respect to the other prior inconsistent statement of the witness (if it was that) which was testified to by Agnes. See *Commonwealth* v. *Ferrara,* 368 Mass. 182, 192-193 (1975). Contrast *Goodney* v. *Smith,* 354 Mass. 734, 737 (1968); *Commonwealth* v. *LaFrance,* 361 Mass. 53, 57 (1972). However, no harm was done. The jury were twice instructed that the Agnes testimony was being received only on the question of the credibility of Mrs. Dutney and was not to be considered as evidence bearing on the guilt of either defendant.

5(*d*). Neither defendant was harmed by the Grondine testimony on the subject of how many times he had in fact voted with Dutney on various issues that had come before the board during the period from March through May of 1973. By agreement of all concerned the original minutes of the selectmen for the entire year 1973 (apparently signed by the defendants themselves) were admitted in evidence. The jury could determine for themselves, from the best evidence available, exactly who had voted with whom, when and on what issues.

5(*e*). Robert Gariepy should not have been permitted to answer the question as to whether it was common knowledge in the town that Robert Gallagher and the two defendants voted together. What the townspeople might have thought as to a record of voting together was hearsay (*Blaisdell* v. *Bickum,* 139 Mass. 250, 252 [1885]; see also *Root* v. *MacDonald,* 260 Mass. 344, 368 [1927]) and was irrelevant on the question of whose votes Gariepy himself might have thought he was buying when he delivered the money to Thomas Gallagher. We think, however, that any possible confusion was dispelled by the admission of the selectmen's minutes.

5(*f*). It was not error to allow the question to Dutney as to whether he had any memory of Robert Gallagher's having been at his house prior to April of 1973. On the evidence already introduced, the jury could have found that Robert Gallagher and Dutney were two of the four participants in a common enterprise to solicit a bribe from the Gariepys, and the degree of intimacy (if any) between those two participants was a legitimate subject of inquiry. See *Commonwealth* v. *Galvin,* 310 Mass. 733, 736, 745 (1942).

5(*g*). Perry had already testified to both sides of the conversation which he had had with Robert Gallagher just prior to the vote on the license application. Accordingly, on its face and so far as the transcript discloses (the relevant bench conference not having been recorded), the question to Roland Gariepy as to what Perry had told him of that conversation must be taken as having called for the truth of what Gallagher had said during the conversation. The question thus called for multiple hearsay and should have been excluded. However, Gariepy's testimony on this point was merely cumulative of Perry's earlier testimony as to what Gallagher had said and which had been properly admitted under the rule stated in part 3 of our opinion.

5(*h*). The conversation which Thomas Gallagher had had with Grondine in late July or early August, 1973, took place several months after the objects of the common enterprise had been accomplished (see *Commonwealth* v. *Mannos,* 311 Mass. 94, 105-106 [1942]; *Commonwealth* v. *Dussault,* 2 Mass. App. Ct. 321, 326 [1974]), but the contents of the conversation were nevertheless admissible against Grondine by reason of his admission of guilt found therein. *Commonwealth* v. *Dias,* 358 Mass. 819 (1971). Dutney voiced no objection, nor did he request a limiting instruction.