COMMONWEALTH *vs.* NEIL R. COLA.

Suffolk.  May 21, 1984. — September 28, 1984.

Present: ARMSTRONG, KASS, & WARNER, JJ.

*Conflict of Interest.  Public Officer. Practice, Criminal,* Instructions to jury, Indictment, Bill of particulars.

At the trial of indictments charging conflicts of interest in violation of G. L. c. 268A, §§ 4 (*c*) and 6 (*a*), the judge's charge to the jury, viewed as a whole, presented no substantial risk of a miscarriage of justice. [603-604]

At the trial of an indictment under G. L. c. 268A, § 6 (*a*), evidence tending to prove that the defendant, while an employee of the Department of Revenue with responsibility for collecting meals taxes due the Commonwealth from a certain restaurant corporation whose tax payments were seriously in arrears, accepted favors and gifts from the individual in control of the corporation, loaned $30,000 to the corporation at a time when it was in reorganization under the Bankruptcy Code, and aided in securing the discharge of the trustee in bankruptcy in order to restore the individual to control of the restaurant, was sufficient to enable the jury to conclude that the defendant had a financial interest in a particular matter, the collection of taxes from the corporation, as to which he acted as a State employee. [604-607] ARMSTRONG, J., concurring.

At a criminal trial, evidence tending to prove that the defendant, while an employee of the Department of Revenue with responsibility for collecting meals taxes due the Commonwealth, acted for an individual and a restaurant corporation controlled by him to minimize and delay the payment of State tax by the corporation was sufficient to enable the jury to conclude that the defendant had violated G. L. c. 268A, § 4 (*c*), by acting as an agent for an entity other than the Commonwealth in connection with a particular matter, the collection of taxes, in which the Commonwealth had a direct and substantial interest. [607-608] ARMSTRONG, J., concurring.

The Commonwealth's bill of particulars with respect to an indictment under G. L. c. 268A, § 4 (*c*), and its theory of the case as presented by the prosecutor in his opening statement were sufficient to specify that the defendant, while an employee of the Department of Revenue with responsibility for collecting meals taxes due the Commonwealth, had acted as agent for a certain restaurant corporation in connection with the payment

of its debts, other than those owed to the Commonwealth. [608-611]
ARMSTRONG, J., concurring.


INDICTMENTS found and returned in the Superior Court Department on December 7, 1982.

The cases were tried before *Linscott, J.*

*Thomas D. Edwards (Stephen M. Perry* with him) for the defendant.

*Frances L. Robinson,* Assistant Attorney General, for the Commonwealth.

KASS, J. Neil Cola was convicted by a jury on separate indictments charging two violations of G. L. c. 268A, the conflict of interest law.

One indictment, founded on G. L. c. 268A, § 4(c), as amended by St. 1978, c. 210, §§ 4 and 5, accused Cola of acting, while a State employee, as agent for someone other than the Commonwealth in connection with a particular matter in which the Commonwealth had a substantial interest. We shall refer to that as the "agency indictment."[1] A second indictment, founded on G. L. c. 268A, § 6(a), charged the defendant with participating, while a State employee, in a particular matter in which, to his knowledge, he and his immediate family had a financial interest. This is the "financial interest" indictment.[2]

---

[1] The indictment closely tracked the statutory language: "No state employee shall, otherwise than in the proper discharge of his official duties, act . . . as agent . . . for anyone in connection with any particular matter in which the commonwealth . . . has a direct and substantial interest." G. L. c. 268A, § 4(c).

[2] The first paragraph of G. L. c. 268A, § 6(a), inserted by St. 1962, c. 779, § 1, provides: "Except as permitted by this section, any state employee who participates as such employee in a particular matter in which to his knowledge he, his immediate family or partner, a business organization in which he is serving as officer, director, trustee, partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest, shall be punished by a fine of not more than three thousand dollars or by imprisonment for not more than two years, or both."

For the agency indictment conviction, a judge of the Superior Court sentenced Cola to one year's imprisonment in a house of correction. As to the financial interest indictment, the defendant was fined $3,000. On appeal, Cola challenges the sufficiency of the government's evidence and claims error in denial of his motions for a required finding of not guilty as to each indictment. He also claims errors in the judge's instructions to the jury.

From the evidence at the close of the prosecution's case,[3] the jury might have found the following:

Cola, a lawyer in the compliance bureau of the Department of Revenue, first met Michael Rapp in 1976, when Rapp saw Cola in his official capacity about past due meals taxes owed to the Commonwealth by one of several restaurants which Rapp owned.[4] Cola and his wife, Marian, became friendly with Rapp and his close friend, Janet Swift. From 1978 through 1981, about three to four times a week, Rapp treated Cola to dinner or drinks at another restaurant he had come to own, the Sea and Surf, in Framingham. During this period the Sea and Surf was accruing indebtedness to the Commonwealth at a rate of approximately $6,000 to $9,000 per month on account of meals and withholding taxes.[5] From December, 1979, to September, 1980, the period of the indictments, Cola was the tax official responsible for the collection of these taxes and Rapp, as he put it, "dealt with Mr. Cola strictly. I saw other people, but I dealt with Mr. Cola." On several occasions Cola filled out Rapp's meals tax returns and

---

[3] The Commonwealth's case did not deteriorate during the presentation of the defendant's evidence, and, therefore, we need not consider separately the defendant's renewed motions for required findings of not guilty at the close of all the evidence. *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 n.1 (1976). *Commonwealth* v. *Dutney,* 4 Mass. App. Ct. 363, 369 n.6 (1976).

[4] We use the verb "owned" in a broad sense, i.e., that Rapp had a controlling interest in whatever business entity had been organized to operate each restaurant and had full managerial responsibility for that restaurant.

[5] By the end of 1979, a significant date in the case, the then liability had grown to $125,557.10. By October 15, 1982, the last date upon which the Commonwealth computed the Sea and Surf's tax liability, the arrearage had grown to $336,120.86.

advised him how to delay paying his taxes. When Cola sensed pressure from his office, he and Rapp would agree on a relatively small payment, often about $2,000, which served to defer more aggressive tax collection measures.

State taxes were not the only delinquency into which Sea and Surf fell. Framingham Food Services, Inc. (Food Services), which owned the real estate in which Sea and Surf operated (the restaurant operating company was Framingham S and S Corporation),[6] fell behind in its real estate taxes. That circumstance precipitated a crisis in December, 1979. The town of Framingham said it would not renew Sea and Surf's alcoholic beverages license unless the taxes were brought current and threatened to remove the license at the stroke of midnight on December 31st, an act calculated to cast a pall over the New Year's revels of seven to eight hundred patrons expected by Rapp at that climactic hour.

To stave off such a calamity, Rapp plunged Sea and Surf into a reorganization under c. 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 et seq. (1976). That maneuver produced the side effect, unpleasant for Rapp, of the installation of a trustee to run the restaurant under the supervision of the Bankruptcy Court. The trustee controlled the cash and was paying expenses such as taxes. Rapp viewed the trustee as "a hindrance on me operating."

Dissatisfied with his loss of control over the restaurant's cash flow, Rapp cast about for means to alter the situation. He spoke several times about his problem to Cola, who represented the interests of the Commonwealth in Sea and Surf's reorganization proceedings. What Rapp needed was $30,000 so that he might deposit that sum with the Bankruptcy Court to cover the claims of unsecured creditors and be in a position to move to have the trustee discharged. Cola agreed to lend Framingham S and S Corporation (S & S) the required $30,000,

---

[6] Rapp testified that, as he was on the brink of exceeding the borrowing limits for Small Business Administration loans, it became expedient to resign his offices in the Sea and Surf corporations and to install his friend Janet Swift in his place. "Janet was actually a front for me," Rapp explained. "I ran the business on a day-to-day operation."

the loan to be secured by a second mortgage on the real estate which Sea and Surf occupied.[7]

Apparently Cola thought it prudent not to receive the mortgage directly. He asked one Volpe, a fellow employee at the Department of Revenue, if a trust of which Volpe was trustee, the Utopia Realty Trust, would hold the mortgage. When Volpe inquired about the identity of the corporation giving the mortgage, Cola told him the principal was Michael Rapp.

On January 8, 1980, in a hallway outside of the Bankruptcy Court, Cola gave Rapp's lawyer a check for $30,000 in exchange for the mortgage, executed by Swift, from Food Services to Utopia. Rapp's lawyer presented the $30,000 check to the Bankruptcy Court and sought to have the trustee removed. A representative of the United States Internal Revenue Service and the trustee in the c. 11 reorganization opposed the removal of the trustee. The trustee testified that Cola also was present, and that, in response to an inquiry by the Bankruptcy Court judge, Cola stated that the Commonwealth did not oppose the removal of the trustee. The court granted Rapp's motion to remove the trustee and Rapp's corporation became a debtor in possession. Rapp repaid the $30,000 to Cola in June of 1980.

Later that year, in September, 1980, Rapp again needed cash. He arranged to receive a check for $20,000 from one Garabedian in exchange for $10,000 and some stock. The ill-conceived idea was that should Rapp fail to pay Garabedian back the remaining $10,000, Garabedian could claim a loss on the stock for which he had purportedly paid $20,000, and come out even. For the $10,000 which he transiently required, Rapp turned to Cola. The latter did not have $10,000 but offered to approach Volpe, whom Rapp had never met, for the money. Negotiations ensued, which culminated in Volpe's agreeing to lend Rapp the $10,000 in exchange for a $1,000 profit. On September 10, 1980, Cola and Volpe took the $10,000 in cash to the Sea and Surf, where they exchanged it with Rapp for a $20,000 check made out to Cola. Volpe accom-

---

[7] The mortgage, thus, would run from Food Services.

panied Cola to a bank, where the latter cashed the check and gave Volpe a check for $11,000. Rapp agreed that a check for $2,000 should be drawn to the Commonwealth on account of taxes in response to pressure upon Cola from his department. In addition, Cola caused a bank check for $3,500 to be written to Boston Edison, to which Rapp also owed money. Cola delivered the cash balance to Rapp at the Sea and Surf.

During the period from December, 1979, through April, 1981 (on the latter date S & S moved to convert the c. 11 reorganization to a c. 7 bankruptcy and the restaurant was closed), Cola continued to tolerate payment of taxes by Rapp at a meager rate. Although Rapp estimated that he had made approximately twenty payments to Cola during this timespan, the records of the Department of Revenue reflected only seven such payments by Rapp.

We turn to the errors of law raised on appeal in inverse order of difficulty.

1. *The jury instructions*. Although Cola's appellate counsel condemns the trial judge's jury instructions as suffused with "pervasive" and "fundamental" error, the flaws were not as obvious at the conclusion of the charge as when appellate counsel performed their autopsy. When invited to comment on the charge, the only subject trial counsel pressed was an amplified instruction to the effect that the burden was on the government to establish that Cola and Rapp in dealing with Sea and Surf had torn the corporate veils shielding S & S, Food Services, and Rapp from one another. Indeed, the judge asked defense counsel, "If I give them 11 [the number of the requested instruction], does that make you happy?" He then gave the desired additional instruction.

As matters developed, it was not the last opportunity counsel had to consider the charge. Two hours after the jury had retired to deliberate, the jury sent to the judge the following remarkable question: "If, now that we have heard all the testimony and the charge to the jury, are we free to decide guilt or innocence on any basis whatsoever (except, of course, for being paid off for a vote)?" The judge told the jurors they were confined to finding facts on the basis of what had developed before them

in the courtroom and to apply the law to the facts they found. Counsel were invited to offer additions and suggested none.

In the circumstances there is no occasion for us to consider the claimed errors in the jury instructions. Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979), provides: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, specifying the matter to which he objects and the grounds of his objection." *Commonwealth* v. *Pope,* 15 Mass. App. Ct. 505, 511-512 (1983). As to the charge, the residual question, therefore, is whether, viewed as a whole, it created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967). *Commonwealth* v. *Howell,* 386 Mass. 738, 739 (1982). We perceive no such risk. The judge paraphrased the pertinent statutes which defined the crime with reasonable accuracy. Nuances and definitions of terminology could unquestionably have been improved upon; the distinction between the agency indictment and the financial interest indictment could have been illuminated with greater clarity. Taken with the Commonwealth's powerful evidence, however, it seems unlikely the jury were misled by defects in the charge. See *Commonwealth* v. *Canon,* 373 Mass. 494, 498 (1977).

After the jury returned their verdicts, the defense moved to set aside the verdicts and for a new trial, for reasons which included errors in the jury instructions. The judge denied the motion without comment and the issues as to the jury instructions were not resurrected for appeal by the new trial motion. Compare *Commonwealth* v. *Buckley,* 17 Mass. App. Ct. 373, 374 (1984).

2. *The financial interest indictment.* In response to the defendant's motion for a bill of particulars on the financial interest indictment (under G. L. c. 268A, § 6[a]), the Commonwealth identified the particular matter in which Cola participated as "[t]he collection of taxes due the Commonwealth of Massachusetts by Framingham S & S Corp." As to the nature of Cola's participation, the particulars specified that "[t]he defendant represented the Commonwealth's interests in the collection of taxes due the Commonwealth . . . ." The

particulars described Cola's financial interest as "[a] business transaction in the amount of [$30,000] . . . ."

It will be recalled that the taxes due the Commonwealth were those of S & S, and Cola's $30,000 loan was secured by a mortgage on real estate owned by Food Services. For that reason, as we follow the argument, the defense contends on appeal that the Commonwealth failed to prove Cola or his family had any interest in S & S and no interest in the collection of taxes from that corporation. Moreover, the defense argues, it was not legally possible for Cola to acquire a financial interest in S & S at the time asserted by the Commonwealth because that corporation was in c. 11 proceedings and lacked authority to incur debt without leave of the Bankruptcy Court.

What the argument ignores is the identity of interest between S & S, Food Services, and Rapp, of which there was ample evidence, including that the $30,000 check procured by Cola was made payable to "Richard Cohen, Attorney for Framingham S & S Corp." "Facts not infrequently exist which warrant or require that courts look through corporate forms to the dominating personality behind them in order to prevent fraud, to protect the public, or to accomplish some essential justice." *New England Theatres, Inc.* v. *Olympia Theatres, Inc.,* 287 Mass. 485, 493, cert. denied sub nom. *E. M. Loew's, Inc.* v. *New England Theatres, Inc.,* 294 U.S. 713 (1934). *My Bread Baking Co.* v. *Cumberland Farms, Inc.,* 353 Mass. 614, 618-619 (1968). Compare *Westcott Constr. Corp.* v. *Cumberland Constr. Corp.,* 3 Mass. App. Ct. 294, 297-299 (1975). The answer to the alleged effect of the inhibitions in the Bankruptcy Code is that the money in fact did travel to S & S.

The term "financial interest" as used in § 6(*a*) may not encompass every creditor relationship. Some may be of a minor, indirect, or diffuse nature which does not give rise to concern proportionate to the significant penalties provided in the conflict of interest statute. See Braucher, Conflict of Interest in Massachusetts, in Perspectives of Law, Essays for Austin Wakeman Scott 3, at 28 (1964). We leave to another day when, and if, that might be the case.

For purposes of the case before us, several factors combine to produce a "financial interest" on Cola's part within the meaning of the statute. First, the $30,000 loaned by Cola (the source of the money was a savings account owned by Cola's wife) was not an insignificant amount, and certainly significant in terms of the assets at Cola's command.[8] Second, the $30,000 loan was to a business teetering on the edge of a fiscal abyss and Cola, as the maker of the loan, acquired an immediate concern with the cash flow of the Sea and Surf enterprise. Collection of taxes, the precise particular matter for which Cola had responsibility as a State employee in regard to Sea and Surf, would be to Cola, as creditor, an undesirable diversion of funds otherwise available to repay him. What happened at the Bankruptcy Court proceedings illustrates the conflict of interest. As a State employee, Cola ought to have been in a position to choose a course which would maximize tax collections. If this involved leaving the trustee in reorganization in charge (a course which a representative of the United States Internal Revenue Service preferred), or even closing the restaurant down, so be it. Cola, as creditor, however, would prefer that the business continue to operate and with Rapp at the helm. Indeed, as Cola had gone to some pains to disguise the source of the $30,000 loan, he would be apprehensive about having a stranger running the business. A third factor which enhances Cola's financial interest in Sea and Surf is the web of relationships he established with Rapp. These included the frequent (i.e., several times a week) dinners and drinks on the house at Sea and Surf, permitting Rapp to give him a set of furniture, and assisting with the arrangement of a further infusion of funds (the convoluted $10,000 loan previously described). We are satisfied that by reason of the factors we have enumerated Cola had a financial interest in the statutory sense in a particular matter, the collection of taxes from the Sea and Surf enterprise, as to which he acted as a State employee. Compare *Graham* v. *McGrail,* 370 Mass. 133, 138 (1976)

---

[8] It will be recalled that, when Rapp needed an additional $10,000 some time later, Cola did not have the money.

(construing G. L. c. 268A, § 19[*a*], a parallel provision governing municipal employees); *Sciuto* v. *Lawrence,* 389 Mass. 939, 947-948 (1983) (also construing § 19[*a*]); *Craven* v. *State Ethics Commn.,* 390 Mass. 191, 201-202 (1983); Braucher, Conflict of Interest in Massachusetts, in Perspectives of Law, Essays for Austin Wakeman Scott 3, 26-27 (1964); Buss, The Massachusetts Conflict of Interest Statute: An Analysis, 45 B.U.L. Rev. 299, 355-356 (1965). Cola did not avail himself of the safe harbor provisions which appear in the second paragraph of G. L. c. 268A, § 6(*a*). Those provide for a disclosure of the particular matter and financial interest by a State employee to the official responsible for the appointment to the employee's position and to the State Ethics Commission. Upon disclosure, § 6(*a*) authorizes a written determination by the appointing official that the interest is not so substantial as to be deemed likely to affect the integrity of the services which the Commonwealth may expect from the employee.[9] Instead Cola used intermediaries and bank checks to mask his connection with the business of Sea and Surf.

3. *The agency indictment.* There was evidence sufficient to convict Cola on the agency indictment as first framed. That indictment, hewing pretty well to G. L. c. 268A, § 4(*c*), charged that Cola, while a State employee, had acted as an agent for someone other than the Commonwealth in connection with a particular matter in which the Commonwealth had a direct and substantial interest. The evidence that Cola acted for Rapp and S & S (i.e., someone other than the Commonwealth) to minimize and delay the payment of State taxes (i.e., a particular matter in which the Commonwealth had a direct and substantial interest) satisfies the elements of the agency indictment.[10] Cola accomplished tax minimization and delay

---

[9] The State Ethics Commission plays no further role; it simply receives a copy of the appointing official's determination.

[10] We understand that revenue agents may — and do — compromise the liability of tax delinquents and arrange for the payment of arrearages on a scheduled basis. Such compromises, however, presuppose a disinterested tax collector who acts in the long term interest of the Commonwealth, untainted by a financial stake of his own in the taxpayer.

of tax payments for Rapp by filing returns for him calculated to keep the tax collector at bay; by encouraging discharge of the trustee in the c. 11 reorganization, who was paying taxes; and by passing up opportunities to apply the loan proceeds to the reduction of tax arrearages.

At first blush, some difficulty arises because neither in the bill of particulars which the Commonwealth furnished, nor in the theory of its case as described in its opening and closing argument, did the Commonwealth emphasize those acts of Cola's which we have identified as proving most obviously the charge framed by the indictment. Rather, the particulars supplied by the Commonwealth on the agency indictment and the presentation of the prosecution's case concentrated on Cola's exertions in obtaining loans on behalf of Rapp and the corporations he controlled as the illicit acts of agency. The Commonwealth's bill of particulars specified the forbidden acts under the agency indictment as follows: "The defendant acted as an agent for Framingham Food Services, Inc. in granting a second mortgage to Utopia Realty Trust. The defendant acted as agent for Michael Rapp in obtaining a loan from one John Volpe. The defendant acted as agent for Framingham Food Services, Inc. in the payment of debts of the corporation, other than to the Commonwealth."[11]

Obtaining loans for a taxpayer from sources other than the Commonwealth, if the loans are unrelated to any interest of the Commonwealth, does not transgress § 4(c). The vice which § 4(c) proscribes is an act of agency (i.e., representation) by a State employee for a private party in connection with *any* particular matter in which the Commonwealth has a direct or substantial interest. This pertains not only to the business of the office in which the State employee is employed, but any State business. Cola would have violated § 4(c), for example, had he, an employee of the Department of Revenue, spoken on Rapp's behalf before the State Department of Public Health

---

[11] Food Services, which was the real estate holding vehicle, did not owe taxes to the Commonwealth. The taxes to the State were owed by S & S. In view of the way Rapp mingled the affairs and assets of these corporations, we make nothing of the confusion in the bill of particulars.

about a public health matter. See Buss, The Massachusetts Conflict of Interest Statute: An Analysis, 45 B.U.L.Rev. at 322-323. See generally Massachusetts State Ethics Commission, Guide to the Conflict of Interest Law 7-12 (Rev. 1983). A major purpose of § 4(c), although not, as we shall see, the only one, is to prevent influence peddling by State employees on behalf of persons who have business with the Commonwealth.

Section 4(c), as opposed, in some circumstances, to other provisions of G. L. c. 268A, e.g., §§ 6 and 23, does not interdict a State employee from acting as an agent in connection with a matter unrelated to State business. To illustrate, Cola could act in Rapp's behalf in recruiting and hiring a new chef and not violate § 4(c).

The defense says that the agency indictment, as specified in the particulars and as tried by the prosecution, describes activity which does not violate § 4(c); that is, that Cola's activity in procuring loans for S & S was unrelated to the particular matter, the collection of taxes, in which the Commonwealth had an interest. See G. L. c. 268A, § 1(k),[12] as amended by St. 1982, c. 612, § 1. Specifications in a bill of particulars "set forth the method and means by which the Commonwealth intended to prove [how] the offence charged in the indictment was committed, and restricted the scope of the indictment and the manner of proof to the grounds alleged in the specifications. The indictment is to be read with the specifications." *Commonwealth* v. *Albert,* 307 Mass. 239, 243 (1940). *Commonwealth* v. *Leavitt,* 17 Mass. App. Ct. 585, 595 (1984). Compare *Commonwealth* v. *Iannello,* 344 Mass. 723, 726 (1962); *Commonwealth* v. *Hare,* 361 Mass. 263, 266-269 (1972).

Upon examination, however, the Commonwealth's bill of particulars discloses that the prosecution did not limit itself to the single theory that acting for the Rapp enterprise to procure loans violated § 4(c). That, as we have said, is a faulty theory.

---

[12] "Particular matter" is defined in § 1(k), as including any "claim, controversy . . . decision, determination, finding . . . ." It would include matters involving taxation. See Report of the Special Commission on Code of Ethics, 1962 House Doc. No. 3650, at 12.

The particulars also specified that the defendant acted as an agent for a corporation controlled by Rapp in connection with the payment of debts of the corporation, other than to the Commonwealth. The particulars further stated that the particular matter in which the Commonwealth had a direct and substantial interest was the collection and payment of taxes. The defense also argues that the Commonwealth on appeal developed a new theory of the agency aspect of the case, viz., that Cola acted for Rapp in the course of the Bankruptcy Court proceedings involving Sea and Surf. In outlining the theory of the government's case in his opening, however, the prosecutor said the evidence would show Cola was not collecting delinquent taxes, that Cola represented the interests of the Commonwealth in the Bankruptcy Court proceedings at the same time that he procured funds for Rapp's corporation and produced them at the Bankruptcy Court in a context disadvantageous to the Commonwealth's tax collection efforts, and that through his actions the Rapp interests received favorable treatment in the tax collection proceedings. When he summarized the evidence in his closing, the prosecutor argued expressly that the evidence had demonstrated that Cola had represented "the interests of S & S and Michael Rapp" at the Bankruptcy Court on a date when it was his obligation "to represent the interests of the [S]tate" and that, more generally, the evidence had shown "that while Mr. Cola was a representative of the Commonwealth, a [S]tate employee, he acted on behalf of Michael Rapp . . . [Paraphrasing the statute], he acted as an agent for someone other than the Commonwealth in a particular matter in which the Commonwealth has an interest."

Divided loyalty, as well as influence peddling, is a target of the "other agency" proscription which appears in § 4(c). Cf. *Commonwealth* v. *Canon,* 373 Mass. at 504 (Liacos, J., dissenting); *Edgartown* v. *State Ethics Commn.,* 391 Mass. 83, 89 (1984) (construing G. L. c. 268A, § 17. Buss, The Massachusetts Conflict of Interest Statute: An Analysis, 45 B.U.L.Rev. at 323. See also Massachusetts State Ethics Commn., Guide to the Conflict of Interest Law 7 (1983). A statute which disapproves known double agency surely con-

demns covert dual representation. Cola's role as a secret agent for Rapp at the Bankruptcy Court proceedings was more malignant than the role of a disclosed agent because the Bankruptcy Court judge was not alerted to having to weigh Cola's recommendations in the light of Cola's role on behalf of Rapp. To so construe § 4(*c*) does not, in the view of a majority of this panel, subject State employees to the risk of conflict of interest prosecution in circumstances where they compromise the Commonwealth's position or appear to show favoritism. Exercise of that sort of discretion, as we observed in another context in note 10, *supra,* is part of the process of public administration. Chapter 268A, § 4(*c*), comes into play when, as in this case, there is a palpable link between the private person doing business with the government and the government employee, whereby the latter is bound — or appears to be bound — to speak and act on behalf of the former.

The Commonwealth, in its particulars and in the presentation of its evidence, touched sufficiently on facts from which a rational trier of fact could find beyond a reasonable doubt that a violation of § 4(*c*) had been proved. At trial the Commonwealth adduced evidence of dual representation by Cola at the Bankruptcy Court proceedings, i.e., that Cola participated in the scheme to extricate S & S from the control of the trustee in reorganization while simultaneously appearing in Bankruptcy Court to represent the Commonwealth's interest. That dual representation worked to the Commonwealth's disadvantage in that the trustee in reorganization had more diligently paid State taxes than Rapp had, or was likely to do. Once again, therefore, the record does not bear out Cola's complaint that the prosecution's theory under the agency indictment was first culled from the record during the appellate proceedings. Cf. *Commonwealth* v. *Canon,* 373 Mass. at 496-498.

Accordingly, the motions for required findings of not guilty were correctly denied.

*Judgments affirmed.*

ARMSTRONG, J. (concurring). I join in part one of the opinion and concur in the result. In my view both statutes (G. L. c. 268A, § 6[a] and § 4[c]) were violated when Cola, representing the Commonwealth in the bankruptcy proceeding (the particular matter), became financially interested in the proceeding himself by his loan to Rapp (through one of Rapp's corporations) and represented Rapp (as well as himself) in arranging the mortgage to Utopia Realty Trust. Both sets of particulars are vague in specifying the particular matter as the collection of taxes due the Commonwealth; but, because the Commonwealth's interest in the bankruptcy proceeding was the collection of taxes, the particulars are only open to criticism for overbreadth. They do not foreclose proof of the indictments in the manner indicated. The particulars on the financial interest indictment do identify the $30,000 loan as Cola's financial interest; and those on the agency indictment identify Cola's representation of Rapp's corporation in arranging the mortgage transaction with Utopia Realty Trust as one of the agency relationships violative of the statute. Consequently the defendant was on notice that the Commonwealth would attempt to prove the defendant's liability under both indictments through his actions in the course of the bankruptcy proceedings, in arranging the financing to extricate Rapp from control of the Bankruptcy Court. With respect to those proceedings Cola was acting, in various capacities, for the Commonwealth, for Rapp, and for himself — the very multiplicity of roles with respect to particular matters that the conflict of interest law was meant to avoid. More than this it is not necessary to say, other than to observe that, as Cola permitted himself to become personally, financially involved in the particular matter in which he was acting for the Commonwealth, this case does not present the more far-reaching question whether a creditor-debtor relationship between a Commonwealth employee (or member of his family) and one who comes before him, in his official capacity, on *any* matter with financial implications, by itself presents a conflict of interest situation under § 6(a). In addition, I would record my reluctance to interpret § 4(c), the agency section, to cover a Commonwealth employee who is

alleged not to have pressed the Commonwealth's claim vigorously enough, thus opening himself to the suspicion that he "took a dive" or showed favoritism. If the reason for the employee's action is that he is receiving compensation therefor, his behavior is made punishable by § 4(*a*). If the reason is that the employee or a member of his family has a personal financial interest, his behavior is made punishable by § 6(*a*). To say that the employee acted as "agent" for the person whom he favored would, in those cases, involve duplication of coverage so extensive as to make §§ 4(*a*) and 6(*a*) superfluous; and in other cases of favoritism (such as political favoritism or favoritism to religious, educational, or charitable organizations or to unions or other special interest groups) would make punishable conduct not generally thought subject to the Conflict of Interest Law (except, in some instances, through § 23); and liability could be made to turn, unsoundly, upon inquisition into motives. General principles of narrow construction of criminal statutes require, in my view, giving the word "agent" something like its normal unmodified (by, e.g., "secret," or "double," or "undisclosed") meaning, which, to me, connotes open representation of another's interests by authority from him. That concept seems to have been in the mind of the draftsman. See Final Report of the Special Commission Established to Make an Investigation of an Act Establishing a Code of Ethics to Guide Employees and Officials of the Commonwealth in the Performance of Their Duties, 1962 House Doc. No. 3650, at 12. See also Buss, cited in the majority opinion, at 327. The latter reads § 4(*c*) as applying to private action by a State employee, rather than his official actions, and reads the core concept to be directed against influence peddling. *Id.* at 323.