**UNITED STATES of America, Appellee,**

v.

**Francis E. DEVIN,
Defendant, Appellant.**

**No. 89–1170.**

United States Court of Appeals,
First Circuit.

Heard Sept. 7, 1990.

Decided Nov. 6, 1990.

SELYA, Circuit Judge.

In May 1988, defendant-appellant Francis E. Devin, a veteran member of the Boston Police Department (BPD), was charged by a federal grand jury with violating the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), and with six counts of attempting to extort money under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951. Following a 14–day jury trial in the United States District Court for the District of Massachusetts, Devin was found guilty on all counts. He now appeals. We affirm.

## I. BACKGROUND

The evidence leading to appellant's indictment was gathered as part of a major investigation into alleged corruption in the BPD dating back to the 1970s. In a previous case arising out of that investigation, we affirmed the convictions of seven of Devin's colleagues on similar charges of racketeering and extortion. *See United States v. Boylan*, 898 F.2d 230 (1st Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). While the circumstances of Devin's case are different, we refer the interested reader to the *Boylan* opinion for the tenor of the times.

### A. *Good Cop.*

In Boston, the city's transportation department (DOT) oversees privately owned parking lots. Under DOT regulations, a license is required for each lot. The license fixes a maximum number of vehicles which may park in the lot at one time; exceeding the authorized capacity is punishable by fine or loss of license. All Boston police officers are required to report violations of DOT regulations, including lot overcrowding.[1] They are also empowered to

William A. Brown, Boston, Mass., for defendant, appellant.

Frank J. Marine, Attorney, U.S. Dept. of Justice, Washington, D.C., with whom Wayne A. Budd, U.S. Atty., and James B. Farmer, Asst. U.S. Atty., Boston, Mass., were on brief for the U.S.

Before BREYER, Chief Judge, VAN GRAAFEILAND,* Senior Circuit Judge, and SELYA, Circuit Judge.

---

* Of the Second Circuit, sitting by designation.

1. The BPD has a comprehensive set of rules and regulations which are issued by the Police Commissioner, posted in BPD guardrooms, read at roll calls, and distributed to all police officers. Section 5 of Rule 102 states that "employees shall be responsible for knowledge of and full compliance with all rules and regulations of the department that apply to their duties." Section 8 requires employees to "obey and comply with all rules, orders, and/or directives of the department whether transmitted verbally or in writing." And section 25 states:

> All officers shall report in writing to their commanding officer all information that comes to their attention concerning organized crime, vice, gaming, liquor or narcotic violations, all felony violations of the criminal statutes of the Commonwealth, and violations

swear out complaints in municipal or state courts with respect to such infractions.

In a similar vein, Boston has a Licensing Board (Board) that regulates the serving of alcoholic beverages, licenses vendors, and enforces the laws governing, *inter alia,* liquor service, illegal conduct on licensed premises (*e.g.,* gaming, prostitution), and occupancy limits in such establishments. Here, too, if the regulations are transgressed, the Board has the authority to impose severe sanctions, including license revocation. Boston police officers, as agents of the Board, are responsible for ensuring that licensees comply with the conditions of licensure and for reporting violations.

The BPD's regulations explicitly prohibit police officers from (1) accepting gifts from persons or businesses with whom they have official dealings; (2) soliciting or accepting any gift or gratuity (including food or drink) for themselves or others from an individual or business when doing so could reasonably be construed to involve the officers' status as employees of the BPD; (3) failing to report to their commanding officer attempts to offer such gifts or gratuities; and (4) doing special favors by participating in situations requiring police intervention that involve friends or relatives, absent an emergency.[2] Similarly, the regulations bar officers from disclosing arrest and conviction records to unauthorized persons and from working private security details without proper intra-departmental permission.[3]

### B. *Bad Cop.*

Appellant became a captain in the BPD in the mid–1960s. The indictment alleged that, from 1969 to 1987, appellant participated in the affairs of an enterprise, the BPD, through a pattern of racketeering activity consisting of multiple acts involving the solicitation or receipt of illegal gratuities and bribes in violation of state law, *see supra* note 2. The grand jury also asserted, in a series of pendent counts, that appellant extorted money under color of official right in derogation of the Hobbs Act. Specifically, the indictment charged that Devin, over the period in question, received a near-googol of unlawful gifts and payments from Simon Gottlieb, owner and president of Stanhope Garages, Inc. (Stanhope), in return for favors such as fixing parking tickets, enforcing parking regulations in a way designed to benefit Gottlieb's businesses, providing unauthorized security escorts, and disregarding capacity limits in Stanhope's parking lots. Additionally, the indictment charged Devin with receiving several unlawful payments from Jean Tasse, an employee of a corporation which operated two nightclubs (Metro and Spit) in Boston.

At trial, the government's case rested primarily on the testimony of Gottlieb and Tasse. We summarize that testimony in conventional post-conviction fashion, depicting the record in the light most amiable to the prosecution and drawing all reasonable inferences in its favor. *See United States v. Zannino,* 895 F.2d 1, 4 (1st Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990); *United States v. Cin-*

---

of the conditions of any licenses which have been issued to persons or premises.

**2.** Insofar as the BPD's rules touch upon gifts, gratuities, and the like, they mirror state law, which prohibits any state, county, or municipal employee from receiving or soliciting any gift, offer or promise of anything of value to influence official acts, Mass.Gen.L. ch. 268A, § 2(b), and also proscribes receipt or solicitation by any public employee of any gift, offer or promise of anything of substantial value for any official act performed or to be performed, *id.* § 3(b). Section 3(b), unlike § 2(b), requires no proof of corrupt intent. *See Commonwealth v. Dutney,* 4 Mass.App.Ct. 363, 375–77, 348 N.E.2d 812, 821–22 (1976).

**3.** While the BPD allows policemen to work in civilian security pursuits during off-duty hours, there are established procedures governing allocation of these assignments. Each police district has a designated detail officer (DDO) through whom all requests from private employers wanting security details are funneled; the DDO maintains a chart indicating the hours each officer has worked on private details; and when a new detail is to be dispatched, the officer with the least number of hours must be offered first crack at the assignment. When a policeman is doing a paid detail, he remains fully subject to the rules, regulations, and special directives of the BPD.

*tolo*, 818 F.2d 980, 983 (1st Cir.), *cert. denied*, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987).

1. *Simon Gottlieb.* Testifying under a grant of immunity, Gottlieb told a sordid tale of payoffs to Devin and others spanning more than two decades. This chronicle of corruption began in the 1960s, when Gottlieb, then working for his grandfather (Stanhope's founder), distributed cash and liquor to members of the BPD at Christmas. By late 1968, Gottlieb had become company president. Around that time, after an unusual number of cars parked in a Stanhope lot were ticketed because their bumpers allegedly extended onto the sidewalk, he was called to the station house and told by the captain, Devin, that the matter could be "worked out." Taking the not-so-veiled hint, Gottlieb crossed Devin's palm and the tickets disappeared. From then on, ticket-fixing became a staple of the relationship; over the next two decades, Devin regularly fixed tickets for Gottlieb at a set rate of $10 per ticket.

Gottlieb learned before long that, just as parking tickets could be made to vanish for a fee, parking citations could also be issued when doing so was to the advantage of someone ready and willing to pay. In the spring of 1970, shortly after Gottlieb opened a new lot in Castle Square and encountered difficulty attracting customers, Devin suggested that, for $40–50 per week, on-street parking near Castle Square could become quite risky, i.e., vehicles would be tagged with abandon. Payments ensued and cars were regularly ticketed for several weeks, until business at the lot began to boom. Gottlieb and Devin made the same type of stipendiary arrangements in 1978 and 1979 (when Stanhope opened new lots in Charlestown and South Boston, respectively). In a burst of entrepreneurial imagination, Devin on one occasion even offered to ticket vehicles parked in the lots of Stanhope's principal competitors.

As Stanhope's business expanded,[4] Gottlieb found it increasingly advantageous to have a friend in high places. We need not catalog the myriad ways in which Devin furnished prompt police assistance to further his patron's ends. A few examples will suffice. When vagrants or prostitutes became a nuisance in a Stanhope lot, or when a Stanhope employee absconded with the day's receipts, Gottlieb called Captain Devin directly; when a naked man and woman engaged in an early-morning tryst in Stanhope's lot on Essex Street, Devin sparked police intervention; after a blizzard, when private vehicles were not allowed to drive into Boston, Devin saw that Gottlieb received an exemption. On several occasions in the early 1980s, Devin assisted Gottlieb in screening employment applicants; he reviewed applications, investigated applicants' backgrounds and, in at least one instance, warned Gottlieb that the recruit had a criminal record. In 1985, when police ordered removal of a Stanhope sign because it was obstructing traffic, Gottlieb informed Devin about the incident, returned the sign to the same spot, and was bothered no more. In June 1987, when a Stanhope employee received his third traffic ticket of the month, imperilling his driver's license, Gottlieb called Devin for help. There was also abundant evidence that, although Devin frequently witnessed illegal overcrowding in Stanhope's lots, he never issued a notice of violation or sought a complaint; to the exact contrary, he several times warned Gottlieb that lots were about to be inspected for overcrowding.

Throughout, Gottlieb made payments to, and bestowed gifts upon, his protector. By 1980, for example, Gottlieb's yearly "Christmas present" to Devin was no less than four cases of premium liquor. Moreover, Gottlieb by then was no longer paying just for specific services as rendered; he was taking Devin to lunch and making regular cash payments of $50 per week (literally under the table, in many instances). These weekly remunerations continued until Gottlieb was subpoenaed to ap-

---

**4.** At time of trial, Stanhope operated no fewer than 40 parking lots and garages in the Boston area.

pear before the federal grand jury in August 1987.

The litany of appellant's fringe benefits was elaborate. At various times, all four of his children were employed by Stanhope. After 1980, Gottlieb regularly hired Devin to work security details. When on these details, Devin would ordinarily accompany Gottlieb from the parking lots to the bank. Sometimes, Devin did so when he was already assigned to work, and recompensed for, duly-authorized details unrelated to Stanhope. Appellant's bodyguard service came about by private arrangement between Gottlieb and Devin, unbeknownst to the DDO or Police Commissioner. At times, Devin arranged for retired police officers to help with security at Stanhope's lots in the Fenway Park area, especially during the baseball season. Regardless of who worked the Stanhope details, all payments were made to Devin, initially in cash and later by checks made payable as designated by him. Devin, in turn, disbursed payments to the other officers. He often had the monthly check made payable to a fictitious person or, sometimes, to his brother. Gottlieb also paid the Devins' hotel bills during several vacations on Cape Cod.

2. *Jean Tasse.* Jean Tasse, who figured prominently in our earlier case, *see* *Boylan,* 898 F.2d at 239–41, testified against Devin under a grant of immunity. Tasse made small cash payments to Devin ($100 in most of the affected years). Devin, in uniform, would visit Metro two or three times each summer, when the club was closed. Each of Tasse's four annual payments was offered during such a visit, following Devin's announcement that he was about to leave on vacation. At Devin's request, Tasse also hired Devin's son. As the *quo* for Tasse's *quid,* Devin gave Tasse his home and business telephone numbers and, in 1982, helped Tasse's employer obtain a license to carry a gun.

5. The Hobbs Act charges were framed variously in terms of the calendar and fiscal years. The counts covered the following intervals: count 2—1983; count 3—1984; count 4—1985; count 5—January 1, 1986 through June 30, 1986;

## II. ISSUES ON APPEAL

Gottlieb's payments to Devin from 1969 to 1987 provided the basis for the first 14 series of racketeering acts charged in the indictment, that is, soliciting and receiving money in return for being induced to do acts contrary to official duty, or to omit acts which duty demanded, in violation of Mass.Gen.L. ch. 268A, § 2(b). The payments from Tasse supplied the basis for four more racketeering acts (a fifth was dismissed for failure of proof) charging Devin with unlawfully receiving money for acts within his official responsibility in violation of Mass.Gen.L. ch. 268A, § 3(b). Gottlieb's weekly cash payments from 1983 to 1987 underlay the Hobbs Act counts.[5] Two forfeiture counts were also lodged pursuant to 18 U.S.C. § 1963(a); in a post-trial proceeding, the same jury that convicted Devin on the substantive charges found in his favor as to forfeiture.

In this appeal, the defendant assigns five paramount errors. His two principal contentions are that the district court erred (1) in admitting proof of the BPD regulations and correlative evidence as to breach thereof, and (2) in failing to grant a mistrial after the government belatedly disclosed that Gottlieb had undergone psychiatric treatment. Defendant's remaining points involve (3) the court's redaction of two exhibits, (4) the interstate commerce element of the Hobbs Act counts, and (5) the judge's supposed hostility. In the pages that follow, we deal at some length with the first two sides of this pented. We treat the remaining issues more summarily.

## III. THE BPD REGULATIONS

The district court permitted proof of Devin's repeated abridgement of BPD regulations. Appellant claims that this evidence was inadmissible and that, in allowing it over contemporaneous objection, the court abused its discretion. The contention is premised more on hope than on reason.

count 6—July 1, 1986 through June 30, 1987; count 7—July and August, 1987. Pre–1983 payments were not charged under the Hobbs Act, presumably because they were time-barred.

## A. *Non–Criminal Conduct.*

■ Devin's gateway argument is meritless. He says, in effect, that the district court should never have looked to Fed.R. Evid. 404(b) when much of this evidence was proffered because the rule does not pertain to non-criminal conduct. Although appellant correctly classifies many of the regulatory breaches as falling into the noncriminal category, e.g., failing to utilize proper channels in arranging for private security details, the very language of the rule defeats the remainder of his argument.[6]

Rule 404(b) allows evidence of "crimes, wrongs, or acts" to be introduced. This disjunctive terminology shows unmistakably that Rule 404(b) reaches conduct which is neither criminal nor unlawful so long as the conduct is probative of, and revelatory as to, a permitted purpose. *See* 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[08] at 404–57 (1990); *see, e.g., United States v. Ingraham*, 832 F.2d 229, 231–37 (1st Cir.1987) (in prosecution for making threatening telephone call, evidence of prior letters, not themselves criminal, admissible as relevant to identity), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *United States v. Rodriguez*, 831 F.2d 162, 168–69 (7th Cir. 1987) (in prosecution for conspiracy, evidence that defendant and co-indictee were together during automobile accident admissible as relevant to knowledge, notwithstanding that "[p]roof of an automobile accident is not proof of a prior crime"), *cert. denied*, 485 U.S. 965, 108 S.Ct. 1234, 99 L.Ed.2d 433 (1988); *United States v. Harrell*, 737 F.2d 971, 978 (11th Cir.1984) (testimony on lifestyle and non-criminal practices of motorcycle club adherents admissible as relevant to motive and means of conspiracy), *cert. denied*, 470 U.S. 1027,

105 S.Ct. 1392, 84 L.Ed.2d 781 (1985). The evidence admitted here was valuable in proving defendant's corrupt intent and knowledge, as well as in "complet[ing] the story of [his] crime[s] by proving the immediate context of events near in time and place." *United States v. Currier*, 821 F.2d 52, 55 (1st Cir.1987). The fact that certain acts were not also crimes was not a ground for their automatic exclusion.

## B. *The Rule 404(b) Test.*

■ This court favors a two step analysis to ascertain whether evidence of other acts should be admitted under Rule 404(b). First, nisi prius must determine whether the evidence has a "special relevance" and is offered not merely to show the defendant's propensity for crime but to establish some material issue. *See United States v. Rodriguez–Estrada*, 877 F.2d 153, 155 (1st Cir.1989); *United States v. Flores–Perez*, 849 F.2d 1, 4–6 (1st Cir.1988); *Ingraham*, 832 F.2d at 231. If the trial court finds that the evidence is specially relevant, it must then balance probative value against the countervailing considerations enumerated in Rule 403 in order to gauge admissibility.[7] "If the evidence brings unwanted baggage, say, unfair prejudice or a cognizable risk of confusing the jury, and if the baggage's weight substantially overbalances any probative value, then the evidence must be excluded." *Rodriguez–Estrada*, 877 F.2d at 155; *see also* 22 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5221 at 309–10 (1978) ("The phrasing of Rule 403 makes it clear that the discretion to exclude does not arise where the balance between the probative worth and the countervailing factors is debatable; there must be a significant tipping of the scales against the evidentiary worth

---

**6.** The rule reads:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b).

**7.** The rule reads:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403.

of the proffered evidence."). We have repeatedly emphasized that such determinations are, within wide parameters, grist for the trial judge's mill. *See United States v. De La Cruz*, 902 F.2d 121, 124 (1st Cir. 1990); *Rodriguez–Estrada*, 877 F.2d at 155; *Ingraham*, 832 F.2d at 231. "Only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1340 (1st Cir.1988).

### C. *Special Relevancy.*

■ Appellant claims that the challenged evidence was admitted solely to portray him as a "bad cop" and was irrelevant since he was on trial for infracting federal law rather than for breaking departmental rules. The court below disagreed, finding that the regulations, and defendant's blithe disregard of them, had special relevance to show knowledge and intent.

■ The court's conclusion seems invincible. After all, the predicate acts charged in the RICO count comprised, *inter alia,* violations of Mass.Gen.L. ch. 268A, § 2(b). In order to obtain a bribery conviction under that statute, the prosecution "must show a corrupt intent on the part of the defendant to be influenced in his future performance of an official act." *United States v. Arruda*, 715 F.2d 671, 681 (1st Cir.1983) (*quoting Commonwealth v. Dutney,* 4 Mass.App.Ct. 363, 375, 348 N.E.2d 812, 821 (1976)). By the same token, specific intent is "part and parcel of a Hobbs Act conviction." *Boylan,* 898 F.2d at 253.[8] The disputed evidence went directly to

these issues. If believed, it showed that the BPD had established rules which all employees were reasonably expected to know and to obey; that these rules were well-publicized; that they prohibited policemen from, among other things, (a) accepting gifts and gratuities from persons with whom they had official dealings, (b) revealing criminal records, (c) performing unauthorized security details, and (d) failing to report license violations; and that defendant, notwithstanding, flouted the rules. Such evidence was unquestionably helpful to the jury in determining whether, as Devin claimed, Gottlieb's payments were innocently given and gratefully received as tokens of amity; or whether, as the prosecution contended, Devin was willing to disregard his sworn obligations and accept things of value which influenced his performance of official duties.

In this case, of course, the uncharged acts were also relevant to depict the setting in which the charged racketeering and extortion took place. We have frequently allowed Rule 404(b) evidence to be used for such a purpose. *See, e.g., United States v. Reveron–Martinez*, 836 F.2d 684, 687–88 (1st Cir.1988) (details of uncharged acts admissible "to show the chain of events forming the context"). Put another way, "other acts" evidence which is closely bound up with the crimes charged is eligible for admissibility under Rule 404(b). *See, e.g., Rodriguez–Estrada*, 877 F.2d at 155–56; *United States v. Fields*, 871 F.2d 188, 193–94 (1st Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989). In short, our decisions recognize that evidence of uncharged conduct may reasonably be needed to relate the complete story of the charged crimes. *See Currier,* 821

8. In *Boylan,* we upheld the district court's instructions that, under the Hobbs Act, the government must prove the defendant acted "knowingly," meaning that "the act was done voluntarily and intentionally, not because of mistake or accident," as well as "willfully," meaning that "the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law." 898 F.2d at 253. In this case, the district court gave essentially the same instruc-

tions. As Devin has not challenged the charge, it is difficult to know what to make of the contention, advanced for the first time on appeal, that his intent in accepting money or gifts was not relevant under the language of the Hobbs Act. We need not mull the apparent contradiction, however, in light of our settled rule that issues not pressed below cannot ordinarily be raised for the first time on appeal. *See, e.g., United States v. Figueroa,* 818 F.2d 1020, 1025 (1st Cir.1987).

F.2d at 55; *United States v. D'Alora,* 585 F.2d 16, 20 (1st Cir.1978). It is hard to imagine a case where the totality of the circumstances surrounding a relationship would have been more valuable to a factfinder as a means of putting the discrete crimes for which defendant was indicted into proper perspective.

To dwell on the topic would serve no useful purpose. On these facts, the relevancy hurdle is an easy jump.

### D. *Prejudicial Effect.*

Appellant's fall-back position is that, even if specially relevant, the regulations' probative value was heavily overbalanced by the risk of jury confusion about whether he was alleged to have violated federal law or constabulary regulations. The heart of appellant's claim is that the testimony about the BPD regulations was so extensive, and the details so sleazy, that the evidence could well have bewildered the jurors and prejudiced them against him. This asseveration cannot withstand testing in the Rule 403 crucible. While we do not doubt that the admission of the disputed evidence was prejudicial and helped to seal the defendant's fate, "all evidence is meant to be prejudicial; it is only *unfair* prejudice which must be avoided." *Rodriguez–Estrada,* 877 F.2d at 156; *see also Ingraham,* 832 F.2d at 233; *Onujiogu v. United States,* 817 F.2d 3, 6 (1st Cir.1987). There was no unfairness here.

For one thing, the probative value of the evidence was great. For another thing, the government did not attempt to saturate the record with the disputed material out of proportion to legitimate need. For a third thing, the lower court handled the matter with consummate care. The record shows that, more than once, the court sustained defendant's objections and blocked questioning that threatened to be cumulative or too near the line. In addition, the clarity of the court's charge was commendable:

> [R]ules and regulations of the Boston Police Department were admitted into evidence in this case. And while they may be relevant in order to show a guideline or a code of conduct to a particular job, the defendant is not here because he violated a rule or regulation. He is charged here with violations of certain specific laws, not rules or regulations.

When all is said and done, the degree of possible (unfair) prejudice cannot conceivably be said to outweigh the evidence's probative worth.[9]

## IV. DELAYED DISCLOSURE

■ In June 1988, well prior to trial, defendant invoked Fed.R.Crim.P. 16 and seasonably requested the government to produce exculpatory evidence, including:

> Any ... evidence indicating senility, mental illness or defect or psychiatric care, drug use, or drunkenness of any prospective trial witness, or any other condition able to affect the witness' ability to perceive or remember the events about which the witness is to give testimony at trial....

At that time, no such evidence was produced in respect to the prosecution's main witness, Simon Gottlieb. Trial began on Monday, November 7, 1988. Gottlieb took the stand the next day. On Wednesday, November 9, while direct examination was still in progress, the prosecutor informed defense counsel that, the previous night, Gottlieb mentioned he had once been treated by a psychiatrist. Appellant immediately moved for a mistrial or, in the alternative, for a continuance. The court below refused to grant a mistrial, ordered the government to provide defense counsel with all relevant medical reports, and allowed Gottlieb to continue on direct examination. The following day, rather than having the witness resume direct testimo-

**9.** Appellant's reliance on *United States v. Cortijo–Diaz,* 875 F.2d 13 (1st Cir.1989), is grotesquely mislaid. On its facts, that case could not be more readily distinguishable. There, we found that the disputed evidence had no special relevance to the charges. *Id.* at 15. We also found the jury instructions to be manifestly inadequate to cure the potential prejudice caused by the disputed evidence, especially since the trial judge's supplementary charge intimated that the defendant's prior bad acts might be used for the forbidden purpose of determining propensity. *Id.* at 15–16. These criticisms simply do not apply to the case at bar.

ny, the court conducted an *in camera* inquiry, ordered a four day continuance during which a defense psychiatrist was permitted to examine Gottlieb, and scheduled a voir dire for the following Monday.

At the hearing on November 14, defense counsel said Gottlieb's attorney had told him that, at some time during Gottlieb's grand jury appearance, the government had been informed of Gottlieb's psychiatric history (including his commitment to a mental hospital in 1974). Counsel also submitted an affidavit from the defense psychiatrist avouching that, although he had examined Gottlieb, he needed an additional month to complete his investigation into Gottlieb's competency. The defendant requested that the charges be dismissed, a mistrial declared, or a 30-day continuance imposed.

The judge conducted the voir dire. Gottlieb's former psychiatrist and his current physician both testified. The defense psychiatrist, though present at the courthouse, was not called; indeed, defendant eschewed presentation of any evidence. At the conclusion of the hearing the judge denied the defense's trichotomous motion, concluding that the delayed disclosure had neither violated the defendant's right to a fair trial nor impaired his ability to present a defense. The judge also ruled that Gottlieb was a competent witness and that the defense was not entitled to a further continuance.

On appeal, Devin tries to persuade us that the government's "suppression" of evidence, and the lower court's rulings with respect thereto, necessitate a retrial. We are unconvinced.

#### A. *The Prosecution's Duty.*

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that the suppression of favorable evidence seasonably requested by a defendant violates due process when the evidence is material to guilt or punishment. *Id.* at 87, 83 S.Ct. at 1196–97. Information useful to impeach prosecution witnesses falls within this rubric. *See United States v. Bagley*, 473 U.S. 667, 678,

105 S.Ct. 3375, 3381–82, 87 L.Ed.2d 481 (1985); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Ingraldi*, 793 F.2d 408, 411 (1st Cir.1986). Where, as here, the defendant has made a pretrial request for specific exculpatory information, reversal is required if nondisclosure "might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976). When the issue is one of delayed disclosure rather than total nondisclosure, however, the applicable test is whether defense counsel was "prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." *Ingraldi*, 793 F.2d at 411–12; *accord United States v. Drougas*, 748 F.2d 8, 23 (1st Cir.1984); *United States v. Peters*, 732 F.2d 1004, 1009 (1st Cir.1984). Although our opinions have not been explicit on the point, we believe that, absent a mistake of law, a court of appeals should review a district court's finding that delayed disclosure was harmless in the *Ingraldi* sense under an abuse-of-discretion standard. *Cf., e.g., Real v. Hogan*, 828 F.2d 58, 61 (1st Cir.1987) (abuse-of-discretion standard governs review of lower court's denial of motion for mistrial); *United States v. Rodriguez*, 738 F.2d 13, 17 (1st Cir.1984) (absent error of law, similar standard governs review of lower court's ruling on motion for new trial).

In this case, there is a factual dispute on the issue of why the delay occurred—a dispute which centers around whether the government knew of Gottlieb's psychiatric history at the time defendant made his pretrial discovery motion. Defense counsel asserts, based on what he was told by Gottlieb's attorney, that the prosecutor was informed of the witness' condition during the grand jury sessions; alternatively, defense counsel maintains that, even if the prosecutor did not actually know Gottlieb's background when the discovery request was filed, the prosecutor should have known about it because he had the witness' diaries in his possession and should have made further inquiry before responding to the discovery request. For his part, the

prosecutor denies any foreknowledge and claims that, if he was told anything about Gottlieb's psychiatric history prior to the third day of trial, he has no recollection of it.

The district court saw no need to make an express finding on when the prosecution was first told of Gottlieb's psychiatric record. Nor do we. Defendant does not claim that the information was withheld in bad faith or deliberately suppressed. That being so, whether the prosecutor knew and simply forgot, *cf. United States v. Krebs,* 788 F.2d 1166, 1176 (6th Cir.) (en banc), *cert. denied,* 479 U.S. 930, 107 S.Ct. 400, 93 L.Ed.2d 353 (1986), or never knew at all, the sockdolager is that the evidence was eventually disclosed. Therefore, as the trial court rightly understood, the critical inquiry is not why disclosure was delayed but whether the tardiness prevented defense counsel from employing the material to good effect. Focusing squarely on this issue, the court below ruled that the defense was given sufficient lead time to utilize the evidence effectively. We turn, then, to this ruling, mindful that, in cases of delayed disclosure, a court's principal concern must be whether learning the information altered the subsequent defense strategy, and whether, given timeous disclosure, a more effective strategy would likely have resulted. *See United States v. Olmstead,* 832 F.2d 642, 649 (1st Cir.1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1739, 100 L.Ed.2d 202 (1988); *United States v. Hemmer,* 729 F.2d 10, 13–14 (1st Cir.), *cert. denied,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984).

### B. *Effect of the Delay.*

Defendant learned of Gottlieb's history midway through the witness' first full day of testimony. The next day, the judge adjourned the trial for the rest of the week, affording defense counsel ready access to the witness and his medical records. This postponement gave the defendant nearly four full days to have the witness examined and to review the records. Trial resumed on the following Monday, but only after a searching voir dire had been held. From that point forward, Gottlieb spent another two and a half days on the witness stand.

■ Defendant argues that, if the disclosure had been made earlier, the first part of Gottlieb's direct examination would have taken a different course. A painstaking review of the transcript belies counsel's entropic assertion that he would have handled Gottlieb's testimony differently had he known the psychiatric history in advance. We have been unable to detect any discernible change in defense strategy before and after the disclosure. In both settings, counsel's objections were substantially the same. Moreover, counsel has put no flesh on the bare bones of his "altered strategy" complaint; he has not pointed credibly to, say, specific objections he might have lodged (but let pass), or particular arguments he might have advanced (but did not). A defendant who claims that his hand was prematurely forced by delayed disclosure cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a *prima facie* showing of a plausible strategic option which the delay foreclosed. Devin has failed to do so.

Defendant's claim that cross-examination of Gottlieb was unfairly hampered rings just as hollow. The cross-examination did not commence until midway through the sixth trial day, nearly a week after appellant first learned of Gottlieb's psychiatric history. By that time, the defense had enjoyed five full days to pore over the witness' medical records. The district judge afforded counsel great liberty in questioning Gottlieb about his psychiatric treatment and counsel exploited that opportunity to the hilt. Cross-examination was incisive and robust. Perhaps, ideally, Devin's attorney might have wished for more time to peruse the medical records—but trials rarely take place under laboratory conditions. What counts is that the five day interval provided an adequate period within which to digest the substance of the materials and prepare for cross-examination.

■ The last arrow in defendant's mistrial quiver is the claim that, had he been aware of Gottlieb's past before trial, he would have selected a "totally different jury." This arrow will not fly. The Constitution guarantees a criminal defendant the right to be judged "by a panel of impartial, 'indifferent' jurors," *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (quoting Lord Coke); *United States v. Moreno Morales*, 815 F.2d 725, 732 (1st Cir.), *cert. denied*, 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 397 (1987), not by a jury believed by defense counsel as likely to view the evidence in a particular way. Appellant has not suggested, much less shown, that the talesmen who sat in judgment of his case were other than impartial and indifferent. Hence, he cannot be heard to complain.

To recapitulate, the district court warrantably found that the time lag in disclosing Gottlieb's psychiatric history did not impair effective use of the information, hinder presentation of the defense, result in unfair prejudice, or cause an alteration in defense strategy. Because our review of the record persuades us that these findings, while perhaps not inevitable, were clearly within the court's discretion, we will not set them aside. *See Krebs*, 788 F.2d at 1176–77; *Hemmer*, 729 F.2d at 14; *United States v. Smith*, 609 F.2d 1294, 1302–03 (9th Cir.1979); *United States v. Ziperstein*, 601 F.2d 281, 291 (7th Cir.1979), *cert. denied*, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980). The delayed disclosure had no effect on the outcome of the trial.

### C. *The Month–Long Continuance.*

■ Appellant's lament that he was afforded too brief a continuance is equally unavailing. This is not a case where the judge demanded that the trial proceed at full throttle, heedless of a defendant's rights. The judge gave a reasonable continuance, affording defense counsel and his retained psychiatrist four days to examine medical records and obtain additional evidence anent Gottlieb's competency. The

judge also arranged for the psychiatrist to examine the witness—an examination which lasted for four-and-one-half hours. We think these steps ameliorated the claimed surprise. At any rate, Devin failed to show an authentic need for a longer continuance. To be sure, he voiced a vague assertion, based on the psychiatrist's conclusory affidavit, that the expert needed the 30 days to consult with Gottlieb and his family.[10] But appellant offered no specifics—and the expert never testified.

■ A party seeking a lengthy continuance midway through an ongoing trial has some burden to persuade the trier that a genuine need for more time exists. There is an important public interest in the efficient operation of the judicial system and in the orderly management of crowded dockets. Hence, mid-trial continuances should be granted sparingly, for good cause shown, not conferred upon litigants merely for the asking. The district judge is at the helm, sensitive to the tides that ebb and flow during a prolonged trial and knowledgeable about systemic demands. He is, therefore, the person best equipped to balance the competing considerations. It follows that an appellate court must show great deference to a district court's decision granting or refusing a continuance, overturning it only for a manifest abuse of discretion. *See Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616–17, 75 L.Ed.2d 610 (1983); *Zannino*, 895 F.2d at 13; *Real*, 828 F.2d at 63. In the case before us, there are simply no grounds for concluding that the judge abused his discretion in deciding to rule on Gottlieb's competency at the conclusion of the voir dire and to recommence the witness' direct testimony that day. The court's refusal of a 30–day continuance was not error.

### D. *Competency.*

■ We are equally reluctant to second-guess the trial judge's competency determination. It is a well-established principle, embodied in Fed.R.Evid. 601, that witnesses are presumed competent to testify.

10. Although Gottlieb's family had apparently been available during the four day postponement, appellant's retained psychiatrist made no attempt to interview them at that time.

The Court said more than a century ago that even a "lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue." *District of Columbia v. Armes*, 107 U.S. 519, 521–22, 2 S.Ct. 840, 841–43, 27 L.Ed. 618 (1883). The determination of competency is primarily for the trial court, *Eisen v. Picard*, 452 F.2d 860, 865 n. 8 (1st Cir.), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972), and an appellate tribunal will overturn a finding of competency only for abuse of discretion. *See United States v. Ramirez*, 871 F.2d 582, 584 (6th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 127, 107 L.Ed.2d 88 (1989); *United States v. Odom*, 736 F.2d 104, 112–13 (4th Cir. 1984).

Here, the court below, which had broad latitude as to whether a competency hearing was even needed, *see, e.g., Odom*, 736 F.2d at 109–11, elected to hold one. The court heard testimony from both Gottlieb's original psychiatrist and his current physician. Pertinent medical records were introduced. Gottlieb suffered a brief, if severe, psychiatric episode 14 years before the trial. He was hospitalized for about a fortnight and treated for some time thereafter. He returned to the business world. His ability to function at time of trial was not called into serious question. Having studied the evidence, we find no misuse of discretion in the district court's ruling that Gottlieb was competent to testify.

## V. OTHER ARGUMENTS

Appellant's three remaining assignments of error call upon us to do no more than apply well-established legal standards to essentially undisputed facts.

### A. *The Christmas Lists.*

■ Among the desiderata introduced by the government to corroborate Gottlieb's testimony were two exhibits listing the names of police officers (including Devin), public officials, and others to whom Gottlieb regularly made payments during the holiday season. These Christmas lists identified, *inter alia*, a Boston municipal court judge and a private citizen (who subsequently became and, at the time of trial was serving as, a federal judge). When moving introduction of the exhibits into evidence, the government suggested deleting these two names. The prosecutor's point was twofold: (1) the names were irrelevant to the case, and (2) broadcasting the identities might bring the judges into public disrepute although neither person had been implicated in any wrongdoing. Defendant argued that the lists should either be excluded or admitted in their entirety. The district court allowed the evidence, removing the judges' names "to save them from unnecessary embarrassment, exposure and humiliation." Later, when limited in cross-examining Gottlieb about the deleted names, defense counsel moved for a mistrial. The motion was summarily denied.

On appeal, Devin complains that redaction deprived him of his rights to confrontation and cross-examination because the jury could not be shown the full scope of the witness' immunity and motivation for testifying. In particular, Devin insists that striking the names left the jury in the dark as to Gottlieb's potential exposure to prosecution for seeking to influence a judge. The plaint contains more bleat than wool.

In *Boylan*, while acknowledging that the right to cross-examine opposing witnesses is constitutionally guaranteed, we observed:

The guarantee extends to the elicitation of information about the immunity granted to a witness in exchange for his testimony. Nevertheless, the right to cross-examine is not unfettered. Defendants cannot run roughshod, doing precisely as they please simply because cross-examination is underway. So long as a reasonably complete picture of the witness' veracity, bias, and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries. Indeed, the judge has the responsibility to do so.

898 F.2d at 254 (citations omitted). The claim which we rejected in *Boylan* was not materially different from the claim before us now. In that case, the defendants urged that limitations placed on testimony regarding the prosecution witnesses' (1) procurement of male prostitutes for a public official and (2) sexual orientation prevented the full scope of the witnesses' immunity and testimonial motivation from being revealed. We nonetheless upheld the trial court's restrictions, finding that vigorous cross-examination of the witnesses on the immunity granted, on their bribes to public officials, and on their involvement in myriad crimes had been more than sufficient to enable the jury "to form a complete and accurate picture of the breadth of the immunity, the [witnesses'] potential motivations, and their likely prejudices." *Id.* at 255. This finding, coupled with our belief that the excluded evidence "had a far greater potential to obscure than to enlighten," left us no principled choice but to approve the trial judge's exercise of his discretion. *Id.*

Much the same can be said here. During a grueling cross-examination, defense counsel probed the numerous payoffs Gottlieb had made to an assortment of public officials other than Devin, all of which, as counsel repeatedly pointed out, were shielded by the grant of immunity. As a result, there can be little doubt that "the jury was in possession of evidence sufficient to permit it to make a discriminating appraisal of [the witness'] motives to testify." *United States v. Tracey*, 675 F.2d 433, 439 (1st Cir.1982). And while it may be true, as appellant asserts, that in a fixer's lexicon a jurist is a "big fish" compared to a police captain, there was no evidence that Gottlieb had actually hooked either of the individuals whose names were stricken. To have let the names be made public would have done nothing to enlighten the jury as to the scope and ramifications of Gottlieb's deal with the government. Such evidence was much more likely to have created a sideshow, unnecessarily distracting the jury's attention from the legitimate issues in the case. Under the circumstances, we find that the court's redaction of the lists was a wise and responsible exercise of its authority.

### B. *Interstate Commerce.*

In a Hobbs Act case, the government must prove that the challenged transaction(s) had an effect on interstate commerce—but the burden is "not onerous." *United States v. DiGregorio*, 605 F.2d 1184, 1191 (1st Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979). There need only be a realistic probability that the attempted extortion will have some slight impact on commerce in order to bring it within the statutory sweep. *See United States v. McKenna*, 889 F.2d 1168, 1171–72 (1st Cir.1989); *United States v. Rivera–Medina*, 845 F.2d 12, 15 (1st Cir.), *cert. denied*, 488 U.S. 862, 109 S.Ct. 160, 102 L.Ed.2d 131 (1988); *DiGregorio*, 605 F.2d at 1190–91. Appellant, although conceding that Stanhope had sufficient contacts with interstate commerce, contends that the government's proof was inadequate because Gottlieb testified that he paid Devin from his "personal funds," i.e., his paycheck, rather than from Stanhope's corporate funds. Gottlieb, individually, appellant theorizes, had no involvement in interstate commerce. We believe this is a distinction which fails to make a difference. That Gottlieb, who was the president and proprietor of Stanhope, may have made the payments to Devin out of funds derived from the income he received from Stanhope attenuates the causal chain somewhat—but the connection remains sufficiently intact, given the modest legal standard, to establish the requisite *de minimis* effect on interstate commerce.

The proof of the pudding is in the case-law. In *DiGregorio*, for example, we held that where payments were extorted from the chief executive officer of a company and its principal owner, the jury could infer that the payment, if made, would ultimately deplete the corporate coffers, whether through direct corporate payment or reimbursement of the corporate officer. 605 F.2d at 1192. To like purport is *United States v. Hedman*, 630 F.2d 1184 (7th Cir. 1980) (en banc), *cert. denied*, 450 U.S. 965,

101 S.Ct. 1481, 67 L.Ed.2d 614 (1981), where the court held the requisite effect on interstate commerce to have been established by evidence that the president and owner of a company engaged in interstate commerce made the extortionate payments out of his company salary. *Id.* at 1193. Here, the jury could easily have been led to draw the same inference.

This drum has been beaten enough. Finding, as we do, that "there was evidence sufficient to support the jury verdict, we necessarily find there was sufficient evidence to let the question go to the jury." *McKenna,* 889 F.2d at 1171. Consequently, we reject the assignment of error.

## C. *The Judge's Hostility.*

Appellant's last stand is that the district court deprived him of a fair trial. He reasons that the judge, having previously presided over the trial of a similar and related case of police corruption, "prejudged every issue and indeed allowed the government to present any evidence it chose without even examining it to determine relevance or materiality." This broadside has two facets: (1) that the judge's rulings were colored by his experiences in the *Boylan* trial, and (2) that the judge was prejudiced against Devin (or in favor of the prosecution). Neither facet has the slightest factual foundation.[11]

■ 1. *Participation In A Related Case.* The fact that Devin's case was reminiscent of a case over which the judge had recently presided was not a disqualifying factor. It is true, as appellant asserts, that the trial judge did on several occasions refer to previous rulings in the *Boylan* case. But such references are neither surprising (given the similarity of legal issues in the two trials) nor sinister. More to the point, "[o]ur system of justice does not require that judges be empty vessels, wholly ignorant of all the antecedents of a case." *Camacho v. Autoridad de Telefo-*

*nos de Puerto Rico,* 868 F.2d 482, 490 (1st Cir.1989) (collecting cases); *see also United States v. Kelley,* 712 F.2d 884, 890 (1st Cir.1983); *United States v. Mirkin,* 649 F.2d 78, 82 (1st Cir.1981). We refuse to lay down a blanket rule that a judge, having heard a case, is forever barred from presiding over any similar or related case. And in this instance, the record does not reveal any unfairness or taint arising out of Judge Mazzone's participation in the two trials.

■ 2. *Prejudicial Conduct.* In his brief, appellant cites several instances of alleged prejudice in connection with the judge's rulings at trial. It would serve no useful purpose to rehearse these vignettes. We are satisfied that they show no more than the court's efforts to expedite the testimony of Simon Gottlieb, who frequently tended to be vague, rambling, and inarticulate. It must be remembered that "[m]ere active participation by a trial judge does not deprive a party of a fair trial." *Aggarwal v. Ponce School of Medicine,* 837 F.2d 17, 22 (1st Cir.1988); *accord Olmstead,* 832 F.2d at 648.

The record does reflect that, time and again, the judge, after listening to the defendant's objections, overruled them. But for the most part, the rulings seem patently correct. In any event, losing round after round in and of itself falls woefully short of showing unfairness or prejudice. That the judge may have exhibited a bit of ire or manifested some impatience at times changes nothing. After all, "[t]hough we expect a trial judge to be sensitive to the judicial role and to exercise restraint, we have no right to anticipate that he will function as some bloodless automaton." *United States v. Polito,* 856 F.2d 414, 418 (1st Cir.1988). Granting the judge the "margin of humanity" that the law and common sense equally demand, *see id.,* we

---

**11.** Defendant at no time moved to recuse Judge Mazzone. Such an omission, in itself, has been held to constitute a waiver of a bias claim arising out of facts known prior to or during trial. *See, e.g., United States v. Branco,* 798 F.2d 1302, 1304–05 (9th Cir.1986); *United States v. Studley,*

783 F.2d 934, 939 (9th Cir.1986); *Hamm v. Members of the Bd. of Regents of State of Florida,* 708 F.2d 647, 651 (11th Cir.1983). We prefer not to decide the point on so circumscribed a basis, however, lest there linger any question as to the judge's fairness.

find the challenged conduct to fall well within the pale.

We have gone considerably beyond the incidents described in appellant's brief and canvassed the record of the 14-day trial to make certain that we have obtained an accurate picture. We have found nothing seriously amiss. We recognize, of course, that "[b]ias and improper conduct by a trial judge may be grounds for a new trial," *Aggarwal*, 837 F.2d at 22, but we also recognize that "[w]hen a party loses calamitously, it may seem an easy excuse to blame the judge and impugn his fairness...." *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1096 (1st Cir.1989). This seems to be a case of the latter stripe. Devin's allegations of bias are bare and baseless.[12]

## VI. CONCLUSION

We need go no further. Our scrutiny of the record persuades us that Devin was fairly tried before an even-handed judge and found guilty in a trial free from significant legal error by an impartial and indifferent jury that weighed evidence properly placed before it. Hence, he was justly convicted. The judgment below will therefore be

*Affirmed.*

---

**12.** Defendant's reliance on *United States v. Chantal*, 902 F.2d 1018 (1st Cir.1990) is entirely misplaced. In *Chantal*, the defendant, about whom the judge had made what we found to be some "regrettable" remarks in a previous trial, *id.* at 1020, made a timely motion for recusal. Holding that the district court had applied the wrong standard in ruling on the recusal motion, *id.* at 1024, we remanded the case in order to allow the court to determine whether disqualification was required under the proper rule of law. *Id.* *Chantal* has no relevance whatever to the situation at hand.