UNITED STATES of America, Appellee,

v.

Gabriel LEMMERER, Defendant, Appellant.

No. 00–1706.

United States Court of Appeals, First Circuit.

Heard Sept. 10, 2001.

Decided Jan. 22, 2002.

factual matters in subsequent nondischarge-ability litigation).

Donald R. Furman, Jr. for appellant.

Dickens Mathieu, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief, for appellee.

Before LYNCH and LIPEZ, Circuit Judges, and DOUMAR,* Senior District Judge.

LIPEZ, Circuit Judge.

Gabriel Lemmerer appeals from his conviction for importation of cocaine and conspiracy to import cocaine. He argues, first, that the government failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Second, he contends that the district court responded inadequately to a problem with one of the jurors, resulting in a violation of Lemmerer's rights under the Sixth Amendment and the Federal Rules of Criminal Procedure. Finding no merit in his claims, we affirm.

## I.

Viewing the evidence in the light most favorable to the verdict, the jury could have found the following facts. *See United States v. Nguyen*, 246 F.3d 52, 53 (1st

* Of the Eastern District of Virginia, sitting by designation.

Cir.2001). At approximately 11:00 p.m. on March 20, 1999, Lemmerer flew into Logan Airport on a charter flight from Aruba. He carried with him two pieces of luggage, and had checked two others: a small green bag, and a larger, hard-shell black suitcase. An Austrian citizen, Lemmerer first proceeded through the immigration check point. He then retrieved his green bag and black suitcase from the baggage carousel and began to walk out of the airport. He quickly was stopped, however, by a United States Customs Service Inspector who found Lemmerer's jacket and long pants suspicious amid the shorts and t-shirts worn by his fellow passengers.

Lemmerer gave the inspector his Austrian passport and a Customs Declaration filled out in German, which indicated that he planned to spend three days at the Hampton Inn in Lawrence, Massachusetts. He then was taken to an inspection area. After searching his other bags, customs inspectors asked Lemmerer for the combination to the black suitcase. The combination Lemmerer provided did not work, but the inspectors were able to open the suitcase using the combination "OOO." Inside, they found women's clothing and scattered pieces of carbon paper, and, hidden at the bottom, five packets containing almost five kilograms of cocaine. Lemmerer was placed under arrest.

The black suitcase had no name tag or luggage claim ticket attached to it, and Lemmerer denied that it was his. However, a pat-down search revealed that Lemmerer had a claim ticket in his pants pocket indicating that he had checked two bags. The search of Lemmerer's luggage also revealed a hotel invoice for a previous reservation at the Hampton Inn, with the confirmation number "86306693." The inspectors also found a separate piece of paper with the name "Johannes Trueber"

and the same confirmation number written on it.

Subsequent investigation disclosed that Lemmerer and Trueber, both Austrian citizens residing in the Dominican Republic, had been traveling together since late January, 1999. Their journey began on January 31, when the two men flew together from the Dominican Republic to Boston, Massachusetts. A man named Ramirez met them at the airport, and they stayed with him for the next five days in an attic apartment at 46 Crescent Street in Lawrence, Massachusetts. Lemmerer and Trueber then took separate flights to Aruba, where they spent the next three weeks in a shared hotel room. The two men returned to Lawrence in late February, again flying separately. This time, instead of returning to the Crescent Street apartment, Lemmerer booked a room at the Hampton Inn, and Trueber joined him there the next day. Shortly after their arrival, they made plans to return to Aruba the following week. Again, Lemmerer and Trueber flew on separate flights, but upon arrival stayed together in the same small hotel room. They remained in Aruba until March 20, when they boarded separate flights back to Boston.

Trueber arrived at Logan at approximately the same time as Lemmerer on the evening of March 20, and checked into the Tage Inn in Lawrence. From there, he placed several calls to the Hampton Inn, asking for Lemmerer. Employees at the Hampton Inn first informed him that Lemmerer had not arrived yet, and then—on the advice of customs inspectors—began forwarding Trueber's calls to a vacant room. Rather than leave a message, however, Trueber went to the Hampton Inn himself, where he learned that Lemmerer had not, in fact, checked in. Trueber left, returned with his luggage, and checked

into a separate room. He later was arrested there.

In April, 1999, Lemmerer and Trueber were indicted on one count of conspiring to import cocaine into the United States in violation of 21 U.S.C. § 963, and one count of importation of cocaine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 952(a). Roughly three months later, a superceding indictment was returned adding a third defendant, Fidencio Jimenez, on the same two counts. The superceding indictment charged that the conspiracy began "on an unknown date but at least by on or about January 31, 1999 and continuing to on or about March 21, 1999."

The district court severed Lemmerer's case from that of his codefendants, and Lemmerer was tried first. His defense strategy was fairly simple. The prosecution's evidence made clear that Trueber was the driving force behind the drug smuggling scheme, which likely had been in place well before Lemmerer became involved. While the government hoped to show that Trueber had recruited Lemmerer as a courier, Lemmerer maintained that he had been tricked into acting as an "unwitting pawn" in Trueber's "master plan." Thus, his defense hinged on the theory that Trueber—the sophisticated, experienced drug smuggler—had taken advantage of the older Lemmerer, who was 65 years old when the two men met, and whose failing health, poor eyesight, and inability to speak either Spanish or English made him an easy target.

Lemmerer's first trial ended in a hung jury, and he was retried in December, 1999. After an eight-day trial and roughly two days of deliberation, the jury found him guilty on both counts of the superceding indictment. The district court sentenced him to 121 months in prison. This appeal followed.

## II.

As noted, Lemmerer offers two grounds for vacating his conviction. He argues, first, that the government unduly delayed the disclosure of material evidence favorable to his defense; and second, that the judge's allegedly improper handling of a difficult juror rendered the verdict invalid. We address his claims in turn, explaining the facts relevant to each.

### A. Delayed Disclosure of Material Evidence

 Lemmerer claims that the government committed a *Brady* violation by failing to disclose promptly certain Western Union records. The Supreme Court held in *Brady* that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. Lemmerer's claim is based on the well-established extension of that rule prohibiting unwarranted delays in the disclosure of material evidence. *See, e.g., United States v. Ingraldi,* 793 F.2d 408, 411–12 (1st Cir.1986) (recognizing that delayed disclosure requires reversal where delay prejudiced defense).

### 1. Factual Background

After its near-loss in Lemmerer's first trial, the prosecution sought to bolster the case against him with Western Union records showing a series of wire transfers between various individuals allegedly connected to the drug smuggling scheme. Some of those records indicated that, during their first stay in Aruba, both Lemmerer and Trueber had received money sent from men claiming to live at the 46 Crescent Street address in Lawrence. Other records, though not tied directly to

Lemmerer, helped support the government's theory that the money wired back and forth (some of which Lemmerer received) was used to buy the cocaine.

Prior to Lemmerer's second trial, his trial counsel[1] attempted to exclude those Western Union records as irrelevant, but the district court concluded that they easily satisfied the minimal requirements of relevance. Defense counsel then requested permission to introduce other Western Union documents of the same nature involving transactions that predated the alleged conspiracy between Lemmerer and Trueber. Although the relevance of the earlier records was less clear, defense counsel argued that they should be admitted "for the sake of completeness." The government did not argue to the contrary, and the district court granted defense counsel's request.

Consistent with those pretrial rulings, the government introduced on the third and fourth days of the trial Western Union transfer records showing that on February 10 and 16, 1999, while Trueber and Lemmerer were in Aruba on their first visit, Trueber received money wired from Lawrence, Massachusetts. The senders identified themselves as Luis Sanchez and Luis Cancel, respectively, and each listed 46 Crescent Street as his address. According to another batch of records, both Trueber and Lemmerer had been wired money on February 26; Lemmerer from the same Luis Sanchez, and Trueber from a man in Colombia named Jose Danilo Rodriguez. A final record indicated that, on February 26, Rodriguez also had wired money to Lemmerer's alleged co-conspirator Fidencio Jimenez, who then was in Venezuela.

Defense counsel introduced other records that showed Trueber following a similar pattern in the year prior to the events

involving Lemmerer. Those records indicated that Luis Cancel had wired money to Trueber in Aruba on October 19 and 26, 1998. Defense counsel also introduced an IRS Currency Transaction Report recording a $12,000 transaction in November, 1997, between Jimenez and Trueber. According to that report, Trueber's address was 46 Crescent Street, Lawrence, Massachusetts.

In addition to the wire transfer records, the government also introduced on the fourth day of trial two hand-written and signed Western Union transfer forms that it had obtained pursuant to the Mutual Legal Assistance Treaty between the United States and Aruba. Such forms must be completed by the recipient of a wire transfer, and these apparently had been filled out and endorsed by Lemmerer and Trueber in connection with the transfers they each received on February 26, 1999. As the government later explained, it had received the transfer forms after the trial had begun, and, therefore, they were not turned over to the defense prior to trial and were not addressed in the pre-trial conference regarding the other Western Union records.

Upon inspecting the forms, defense counsel noticed that both appeared to have been completed (if not signed) by the same person, presumably Trueber. Such a finding would support Lemmerer's claim that Trueber had arranged for the money to be wired in Lemmerer's name, but that it was not truly intended for him. Accordingly, counsel set about trying to obtain similar transfer forms for the other wire transactions in October, 1998, and February, 1999, hoping to get more examples of Trueber's handwriting. Western Union, however, refused to give her the forms, referring her instead to the government's subpoena.

1. Lemmerer is assisted by different counsel on appeal.

Convinced that the government already had the documents she sought, defense counsel filed a motion to compel discovery and for a continuance on the sixth day of trial.

The government denied having the transfer forms. Indeed, the prosecutor stated unequivocally that "every document that we've received from Western Union we have turned over to [defense counsel]." In response to prodding from the district court, the prosecutor confirmed that the government had requested (and disclosed to the defense) "all documents" relating to Trueber and Lemmerer, without limit of time. Satisfied that defense counsel had seen "everything the government has," the court refused to grant a continuance, but nevertheless agreed to enter an order directed at Western Union compelling the production of the documents.

That evening, attorneys for the prosecution faxed defense counsel three new Western Union records involving wire transfers to and from Trueber in 1997. Specifically, the records showed (1) a wire transfer on September 22, 1997, from Raphaela Rosario in Lawrence, Massachusetts, to Trueber in Aruba; (2) a wire transfer on October 23, 1997, from Juan Albert Rodriguez in Lawrence, Massachusetts, to Trueber in Aruba; and (3) a wire transfer on November 20, 1997, from Trueber in Boston, Massachusetts, to Karl Brandstatter in Aruba.

During a sidebar conference the next day (the seventh, and second-to-last, day of trial), the prosecutor explained that, after receiving the initial batch of documents (which had been turned over to defense counsel), the government received "another traunch [sic] of documents that related only to Mr. Trueber, and those documents were not within the period of the conspira-

cy, [but] were from 1997 in fact, and we put those in a separate file an stashed them away for Mr. Trueber's trial." After the conference the previous day, he continued, government attorneys had double-checked their files to confirm that they had given defense counsel all the Western Union materials. On the suggestion of one of the customs agents, they checked the separate file for Trueber's trial, and there found the three additional records at issue. Those records, the prosecutor pointed out, were not "responsive to the motion to compel [discovery], they relate to 1997 transactions and they do not include any handwritten receiver documents."

 Unsatisfied by that explanation, defense counsel argued that, in light of the previous trial, the prosecution was "well aware of the defense in this case." Accordingly, it was "disingenuous for the government to stand before the Court and say that they had a separate, independent parallel investigation going on into Mr. Trueber ... in an effort to keep documents that potentially could exonerate Mr. Lemmerer from the defense." Defense counsel explained that the 1997 records

> show[ ] that Mr. Trueber had a plan in effect years before Mr. Lemmerer met Mr. Trueber. Therefore, to the extent Mr. Lemmerer's signature is on that Western Union form it clearly exonerates him because his signature is only on one form and Mr. Trueber has been engaged in at least eight, now eight, which I didn't know prior to yesterday, transactions with Western Union.

Therefore, she concluded, the government's "refusal" to disclose the records to the defense was error under *Brady*. As a remedy, defense counsel requested that "all Western Union documents be excluded from the trial." [2] Given that both the de-

---

**2.** We recognize that, ordinarily, the proper course for defense counsel upon learning that

fense and the prosecution already had introduced several such documents, defense counsel's proposed remedy would have entailed striking evidence previously admitted and published to the jury. The district court denied the motion, explaining, "I don't think these are *Brady* material. I think the government has made the disclosures which are required under the rules."

Defense counsel introduced the three 1997 records into evidence the next day (the last day of the trial).[3] In her closing argument, she incorporated the records into the general theme of Lemmerer's defense: that he had been used by Trueber, the experienced drug smuggler. Lemmerer's "age and other physical limitations," defense counsel told the jury, "make him vulnerable to being used ... by someone younger, more sophisticated, and definitely more versed in traveling from the Dominican to the United States to Aruba and having wire transfers sent back and forth." Of the two men, she continued, it was Trueber who had a preexisting connection to Lawrence, as evidenced by "the financial documents going back as far as '97." Defense counsel also urged the jury to "look at the documents concerning Johannes Trueber. Look at the money he spends." Finally, she used the records involving transfers to and from Trueber to remove the sting from the February 26, 1999, wire transfer to Lemmerer, explaining that "Johannes Trueber needed Lem-

merer on this day because it's the only day that there are two transactions. The only day."

### 2. *Analysis*

 On appeal, Lemmerer argues that the government's failure to disclose immediately the Western Union records violated his rights under *Brady*. In analyzing that claim, we will assume, *arguendo*, that the Western Union records fall within the category of evidence to which *Brady* applies. On that assumption, the government was obligated to disclose them promptly if they were both "favorable" to Lemmerer's defense, and "material." 373 U.S. at 87, 83 S.Ct. 1194. Evidence is "material" for *Brady* purposes " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (Blackmun, J.)). In determining whether the evidence at issue satisfies the materiality standard, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler v.*

---

the government did not promptly disclose potentially exculpatory evidence is to request a continuance so that she can regroup and respond effectively to the new information. *See United States v. Osorio,* 929 F.2d 753, 758 (1st Cir.1991) (noting that defense counsel normally must request a continuance in order to preserve claim that defense was prejudiced by delayed disclosure of material evidence). Nevertheless, counsel's request to exclude all the Western Union documents was adequate to preserve Lemmerer's *Brady* claim for appeal.

3. Thus, when they retired for their deliberations, the jury had before them ten Western Union wire transfer records. Five records, introduced by the government, showed wire transfers during the period of alleged conspiracy between Lemmerer and Trueber. Most of those transfers involved either Trueber or co-conspirator Jimenez, but one was directed to Lemmerer. In response, defense counsel had introduced five other records showing wire transfers to and from Trueber in the years preceding the conspiracy.

*Greene,* 527 U.S. 263, 289–90, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *see also Bagley,* 473 U.S. at 675, 105 S.Ct. 3375 (explaining that prosecutor is obligated to disclose evidence that, if suppressed, would "deprive the defendant of a fair trial").

The same standard applies when the claim is one of delayed disclosure rather than complete suppression. However, in delayed disclosure cases, we need not reach the question whether the evidence at issue was "material" under *Brady* unless the defendant first can show that defense counsel was "prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." *Ingraldi,* 793 F.2d at 411–12. The "principal concern" in such cases is "whether the failure to supply the information in a seasonable fashion caused the defense to change its trial strategy." *United States v. Josleyn,* 99 F.3d 1182, 1196 (1st Cir.1996). Thus, the defendant must show that "learning the information altered the subsequent defense strategy, and [that], given timeous disclosure, a more effective strategy would likely have resulted." *United States v. Devin,* 918 F.2d 280, 290 (1st Cir.1990). He "cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a *prima facie* showing of a plausible strategic option which the delay foreclosed." *Id.*

Lemmerer has not satisfied that threshold burden. Indeed, he does not even attempt to explain how the government's failure to disclose promptly the 1997 records altered his defense strategy. Instead, he argues that defense counsel "would have [had] documentary evidence" that Trueber had a drug smuggling operation in place years before he met Lemmerer if the government had disclosed the evidence more promptly. Given Lemmerer's "innocent dupe" defense, the argu-

ment goes, "the more evidence admitted concerning the expertise, experience and success of Johannes in smuggling drugs ... the more Mr. Lemmerer's chances for acquittal improve."

The difficulty with that argument is that the 1997 records *were* admitted into evidence, and defense counsel incorporated them ably into Lemmerer's existing defense. Lemmerer's counsel emphasized in her opening statement that Lemmerer had been an "unwitting pawn" in Trueber's scheme. She pressed that defense theory as the trial progressed, supplementing it when possible with documentary evidence that Trueber had engaged in similar activity in previous years. The 1997 records fit neatly into that strategy. Accordingly, after introducing them on the last day of trial, defense counsel used the records in her closing argument to support the theory that Trueber was a sophisticated and experienced drug smuggler who duped Lemmerer into participating in his scheme.

In short, nothing in the record indicates that the government's delay in disclosing the 1997 records "foreclosed" a "plausible strategic option," *Devin,* 918 F.2d at 290, or prevented defense counsel from using them effectively, *see Ingraldi,* 793 F.2d at 411–12. Therefore, even assuming that the Western Union records qualified as *Brady* material, the government's failure to disclose them promptly did not violate the strictures of *Brady.*

## B. Jury Issues

Lemmerer maintains that a new trial is required because the district court responded inadequately to a juror's request to be excused from the ongoing deliberations. That error, he argues, resulted in a violation of his rights under the Constitution and the Federal Rules of Criminal Procedure.

## 1. *Factual Background*

The relevant facts are as follows. On the morning of the second day of deliberations—Thursday, December 23—the jury sent out a note asking for a transcript of Lemmerer's testimony. The judge informed them that the transcript was not ready at that time, and likely would not be complete until early the next week. Accordingly, he instructed them to continue their deliberations based on their own recollections and notes.

At approximately 12:30 the same day, the judge received a second note, this time from Juror 36. The note read:

> I am asking to be excuse [sic] from this jury as soon as possible. [Juror's signature.] If not I am leaving.

The judge met promptly with Lemmerer, his counsel, and the prosecutor, and proposed to tell the jury to suspend its deliberations for lunch so that he could meet with Juror 36. He explained further what he planned to do:

> I will start out by telling her that she is not to tell me anything at all, anything, about what is going on in that room. But in fairness I need to know whether something else is bothering her. And we'll see what she says. If I am satisfied that what is bothering her is from within that room and not something else entirely, then I conceive it my duty to tell her that she cannot be excused, she is to go back into that room, and end on that.

After a brief colloquy with the prosecutor, the judge reiterated that if it appeared that Juror 36 simply was uncomfortable because she found herself disagreeing with the other jurors, he would require her to return and deliberate, "but with no suggestion that she has to agree." Defense counsel told him, "[w]hat you propose is fine."

The judge then met with Juror 36, with counsel present. As promised, he began by telling her that he did not want her to tell him what was going on in the jury room. He then asked whether something was making her uncomfortable, and, if so, whether it was related to the case. Juror 36 said that, "[i]t has something to do with this case and it's my service as a juror." The judge therefore instructed her to return to the jury room and continue her deliberations, repeating his earlier statement to counsel that he could not excuse a juror from service simply because she was "uncomfortable about whatever is going on in the jury room."

Juror 36 refused, however, saying, "No. No. No. I'm not going back." The judge admonished her:

> Well, that is your duty. You must go back. And you must continue to deliberate with the other jurors. I do not for a moment suggest that you surrender or alter any view or anything you may have said or thought about the case, that's for you to decide, for you to consider, but you are chosen as a juror, as one of the judges in this case.

Still, Juror 36 did not relent. Instead, she stated that "[i]f I go back I'm not going to say anything. I'm not even going to put forth a verdict or anything. I don't want anything to do with this." The judge reminded her again of her duty as a juror, explaining, "[y]ou're chosen to be a juror in this case. And a verdict in a case must be unanimous. So I cannot tell you how to deliberate or what to do. And I'm not. You do what you think is just and fair in this case, and what you decide is just and fair and fine." Juror 36 continued to insist that she would "not go back," adding that if there was a penalty, she would be willing to pay the fine. "There's no fine," the judge told her. "There's no fine. It's your duty. So you must go back. So, go

back, have lunch, and then continue your deliberations. That's the order of the Court."

The clerk escorted Juror 36 back to the jury room, and the judge turned to counsel, seeking their reaction to the interchange. "What do you think?" he asked them. "Any objections to anything I said to her?" Lemmerer's counsel responded, "No." The prosecutor, however, stated that he had "a concern," although not with the judge's remarks. Rather, he explained:

> I have serious concerns based on her repeated, repeated refusals in saying to the Court that even if I'm going back in there I'm not going to say anything and that she's not following the Court's instruction if she's not deliberating. And I would ask that the Court excuse her. But I'm going to take an opportunity to look at the law if that's beyond your power, but I do believe it's within your power....

After prompting from the court, defense counsel agreed that she too "would like to go and research it first before I make any determination." The judge then asked, "[h]ow do you feel as a practical matter in this sense.... [I]f you both agree I can excuse her. And then I have two options. I can ... send in the alternate, or I can go down to eleven, and just have them continue deliberating. Do you want to express yourself on that? Do you want to think about it?" Defense counsel indicated that she would like to "think about it and do some research."

After some further discussion, the judge, defense counsel, and the prosecutor agreed that the attorneys would "go and think about it." When and if they came to an agreement "as to any course of action," or if either party "want[ed] to be heard to ask [the judge] to do something legally," counsel would so inform the court. In the meantime, the jurors would resume delib-

erations as soon as they finished lunch, without any further instructions.

The jurors began to deliberate again slightly before 1:00 p.m. Half an hour later, they sent out another note, reading: "We are at a standstill. We feel that we need the court transcripts [of Lemmerer's testimony] to help us move forward." By that time, the judge had learned that the transcript could be ready by the following Monday, December 27. He determined that the best course was to adjourn for the Christmas holiday a few hours early that Thursday, with the jury to resume deliberations at 9:00 a.m. on Monday.

Although the record is somewhat unclear on the point, it appears that Juror 36 arrived at the courthouse late on Monday, December 27, and, as a result, court did not resume until approximately 10:30 a.m. Before sending the jury out to continue its deliberations, the judge went through the usual questions regarding media reports and discussion of the case over the three-day weekend. The jurors disclosed no problems. The judge then gave them the transcript of Lemmerer's testimony they had requested the previous Thursday, and instructed them to resume their deliberations. Neither lawyer objected to Juror 36's continued service.

After slightly less than two hours of deliberation, the jury returned a verdict of guilty on both counts. Juror 36 gave no indication that she did not agree with the verdict, or that she had not voted either way. Defense counsel did not request that the jury be polled.

### 2. Analysis

Lemmerer contends that the sequence of events leading up to the verdict entered on December 27 resulted in "a fundamental violation of [his] right to a jury trial guaranteed by the Sixth Amendment to

the Constitution." His argument is difficult to decipher, and seems to proceed along two contradictory lines. In his opening brief, Lemmerer appears to contend that the district court erred in allowing Juror 36 to remain on the panel after she stated that she would not participate further in the deliberations. Thus, portions of his brief suggest that the court should have excused Juror 36 under Rule 23(b) of the Federal Rules of Criminal Procedure, which permits a verdict to be rendered by eleven jurors if the judge concludes that it is "necessary" to excuse a juror for "just cause" after deliberations have begun.

In his reply brief, however, Lemmerer explicitly disavows any reliance on Rule 23(b). Instead, he seems to argue that the district court erred in failing to ensure that Juror 36 would stand firm in her independent judgment in the face of pressure from the other jurors. In his view, Juror 36 was the sole hold-out for acquittal, an uncomfortable role that prompted her request to be excused from the panel. Although Lemmerer concedes that the district court's response to her note was "immediate and thorough," he maintains that the judge failed to persuade Juror 36 to honor her oath. Indeed, by instructing Juror 36 to "do what you think is just and fair," the judge encouraged her to "acquiesce in a verdict if she was so disposed." As a result, Juror 36 did not take an active role in the jury's deliberations in the afternoon of December 23 and the morning of December 27. Content to go

along with whatever the other eleven jurors chose to do, Juror 36 gave up any attempt to convince them of Lemmerer's innocence, and her vote to convict him did not reflect her true belief that he should be acquitted. In that sense, Lemmerer concludes, the verdict announced on December 27 did not represent the judgment of all twelve jurors.

 As the government points out, Lemmerer did not present either of those claims to the district court.[4] Accordingly, he is not entitled to a new trial unless he can satisfy the exacting plain error standard. In order to prevail, Lemmerer must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *United States v. Gomez*, 255 F.3d 31, 37 (1st Cir.2001) (citing *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

 We turn first to the claim that the district court erred in permitting Juror 36 to remain on the panel without further questioning or instruction. Trial judges enjoy broad discretion in determining how best to respond to problems of jury management, and normally we will not reverse unless the judge's choice among the various avenues available was patently unreasonable. *See, e.g., United States v. Balsam*, 203 F.3d 72, 86 (1st Cir.2000) (explaining that trial judge's re-

---

**4.** The government also argues that Lemmerer waived any claim that the district court should have excused Juror 36 under Rule 23(b) by "affirmative[ly] accept[ing]" the judge's decision to return Juror 36 to the panel on the afternoon of December 23. Thus, the government contends that we cannot review Lemmerer's claim even for plain error. *United States v. Olano*, 507 U.S. 725, 732–33, 113 S.Ct. 1770, 123 L.Ed.2d 508

(1993) (explaining that waiver of a right extinguishes all appellate review). We disagree. Although Lemmerer certainly forfeited any objections to the district court's handling of Juror 36 by failing to raise them promptly, his silence does not constitute an "intentional relinquishment or abandonment of a known right," as required for a finding of waiver. *Id.* at 733, 113 S.Ct. 1770 (internal quotation marks omitted).

sponse to allegations of juror misconduct is reviewed for "patent abuse of discretion"); *United States v. Rowe*, 144 F.3d 15, 20 (1st Cir.1998) ("[W]e will not intervene unless the trial court's denial of a cause-based challenge to a juror [under Rule 23(b) ] constitutes a 'clear abuse.' "); *United States v. Angiulo*, 897 F.2d 1169, 1185 (1st Cir.1990) ("Substantial deference is due the trial court's exercise of its discretion in handling situations involving potential juror bias or misconduct."). That deference stems from our recognition that, "[i]n managing juries, trial judges are constantly faced with practical problems, ranging from jurors' dentist appointments to personal disputes among jury members to rare family tragedies.... Quite often some costs or risks attend every alternative open to the court." *United States v. Chorney*, 63 F.3d 78, 81 (1st Cir.1995). Accordingly, "[w]here the trial judge takes the time to hear counsel and thoughtfully weighs the options, we will not second guess the decision unless the balance struck is manifestly unreasonable." *Id.; see also United States v. Barone*, 114 F.3d 1284, 1307 (1st Cir.1997) ("The trial judge has substantial discretion under Rule 23(b) to remove a juror after deliberations have commenced where the judge has determined that the juror's ability to perform her duties has been impaired."). Our review is even more circumscribed where, as here, defense counsel did not raise a contemporaneous objection to the trial judge's chosen course of action.

 We find no error, plain or otherwise, in the district court's decision to keep Juror 36 on the panel. Faced with a recalcitrant juror, the judge took an eminently reasonable course, reminding Juror 36 several times that it was her sworn duty to continue deliberating and ordering her to do just that. In light of those admonitions, the judge apparently concluded that

Juror 36 would continue to deliberate in good faith. Our cases make clear that "[t]he judgment of the trial judge, who can appraise the jurors face to face, deserves great weight." *United States v. Walsh*, 75 F.3d 1, 7 (1st Cir.1996). We certainly "have no occasion to upset [the judge's] on-the-spot judgment which, if not reflecting the only way the matter could have been handled, reflected a rational and fair disposition." *United States v. Corbin*, 590 F.2d 398, 401 (1st Cir.1979).

 We turn, then, to Lemmerer's argument that the jury's verdict was not truly unanimous. *See* Fed.R.Crim.P. 31(a) (stating that verdict "shall be unanimous"); *Richardson v. United States*, 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999) (stating that "a jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element"); *Johnson v. Louisiana*, 406 U.S. 366, 369–71, 92 S.Ct. 1635, 32 L.Ed.2d 162 (1972) (Powell, J., concurring) (reasoning that unanimity in federal criminal jury trials is constitutionally required, and citing cases to that effect). As noted, Lemmerer's opening brief focuses primarily on the district court's decision to return Juror 36 to the panel after their meeting on December 23. Only in his reply brief did Lemmerer disavow any reliance on Rule 23(b) and articulate explicitly his unanimous verdict claim. As a general rule, we will not consider arguments made for the first time in a reply brief. *See, e.g., N. Am. Specialty Ins. Co. v. Lapalme*, 258 F.3d 35, 45 (1st Cir.2001).

 Even if a unanimity claim could be eked out of Lemmerer's opening brief, we would find no error. Put simply, there is no evidence that the verdict was not unanimous. There was no indication on December 27 that Juror 36 disagreed with the verdict or had not joined in reaching it. If, as he now argues, Lemmerer

believed he was about to be convicted on the judgment of only eleven jurors, he should have exercised his right to poll the jury individually before the verdict was recorded, so that "any doubts whatever about the state of the jurors' minds could have been cleared up and appropriate action taken before the jury was dismissed." *United States v. Luciano,* 734 F.2d 68, 70 n. 1 (1st Cir.1984) (internal quotation marks omitted). Rule 31(d) of the Federal Rules of Criminal Procedure provides that, "[a]fter a verdict is returned but before the jury is discharged, the court shall, on a party's request, ... poll the jurors individually." The rule is designed for cases precisely like this one, to "enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented." *Miranda v. United States,* 255 F.2d 9, 17 (1st Cir.1958).

Lemmerer points out that Juror 36's note—and her comments to the district court during their meeting on December 23—revealed her intention to cease deliberating if forced to remain on the panel. Moreover, the jury returned its verdict relatively quickly after Juror 36 returned, suggesting (Lemmerer maintains) that Juror 36 acquiesced in the judgment of the other eleven jurors. In these circumstances, Lemmerer insists that a non-unanimous verdict may be "inferred from the facts." We disagree. As we explained above, the trial judge reasonably concluded that Juror 36 would follow his instructions and resume deliberations, and we see no reason to doubt that judgment.

▮ Our conclusion is bolstered by the "longstanding presumption that jurors normally follow the instructions given

them by the trial court." *United States v. Rullan–Rivera,* 60 F.3d 16 (1st Cir.1995); *accord Olano,* 507 U.S. at 740, 113 S.Ct. 1770 ("[It is] the almost invariable assumption of the law that jurors follow their instructions. [We] presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." (internal quotation marks and citations omitted)). Lemmerer contends that we should ignore that presumption here, since Juror 36 specifically stated that she would not obey the district court's orders. However, the record indicates that Juror 36's threats were just that.

For example, contrary to her statement that she would "not go back," Juror 36 returned to the jury room after her conversation with the district court judge. Even more telling, the jury sent out a note indicating that they were still deadlocked in the afternoon of December 23, *after* Juror 36 returned from her meeting with the judge.[5] That note suggests that, contrary to her statement that she would not "say anything" if forced to return to the jury room, Juror 36 continued to participate in the deliberative process. Finally, contrary to her statement that she would "not put forth a verdict or anything," Juror 36 evidently did vote on December 27. Lemmerer does not argue otherwise; his claim is simply that Juror 36 did not truly agree with the vote she cast.

▮ In sum, our review of the record gives us no reason to disturb the time-honored presumption that, "when the jury returns from its deliberations to announce its verdict it has obeyed the court's instruction that if a verdict is returned it

---

5. Lemmerer's opening brief states erroneously that the jury did not engage in any deliberations in the afternoon of December 23, but instead was excused immediately after lunch.

must be a unanimous one." *United States v. Shepherd,* 576 F.2d 719, 724 (7th Cir. 1978) (citing 2 Hale, *History of the Pleas of the Crown* 299 (1st Am. ed. 1847)).

*Affirmed.*